**E-FILED**
Thursday, 02 July, 2009  05:14:54 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

# IN THE CIRCUIT COURT OF THE FOURTH JUDICAL CIRCUIT
## CHRISTIAN COUNTY, ILLINOIS

Robby Mohr, as Administrator of Estate )
of Jolee Mohr, )
         )
         )
        Plaintiff **FILED** )
    vs. )
         )
Targeted Genetics, Inc.,    AUG 1 5 2008 )
        *Donna M. Castelli* )
     and     Circuit Clerk )
        Christian County )
Abbot Laboratories, Inc., )
         )
     and )
         )
Western Institutional Review Board, Inc. )
         )
      Defendants. )

Case No. 08-L- 31
JURY TRIAL DEMANDED

## COMPLAINT CIVIL ACTION

NOW COMES Plaintiff, Robby Mohr, as Administrator of the Estate of Jolee Mohr, through his attorneys, and for his Complaint, state as follows:

### PARTIES

1.    Plaintiff Robby Mohr was the husband of Jolee Mohr. He files this action individually and as the administrator of the Estate of Jolee Mohr. (A copy of Letters of Administration is attached as Exhibit A.) He is a citizen and resident of Taylorville, Christian County, Illinois.

2.    Defendant Targeted Genetics, Inc. ("TG") is a Washington corporation that purports to discover, develop, manufacture and market biotherapeutics and biopharmaceuticals. TG is located at 1100 Olive Way, Seattle, Washington, 98101.

3.    Defendant Abbott Laboratories, Inc., (Abbott) is an Illinois corporation with a principal place of business in Abbott Park, Illinois, and transacts business regularly in Christian

County, Illinois, including but not limited to the sale and delivery of its drug Humira to Plaintiff's decedent in Christian County, Illinois.

4. Defendant Western Institutional Review Board, Inc. ("WIRB") is an independent instituitional review board ("IRB") contracted to protect the interests of patients enrolled in clinical trials and to monitor the protocols to ensure that they comply with federal regulations. WIRB is believed to be a Washington corporation with a principal place of business at 3535 7th Avenue SW, Olympia, Washington, 98502.

## INTRODUCTION

5. For seven years preceding Jolee Mohr's date of death on July 24, 2007, Jolee Mohr was treated for rheumatoid arthritis which was under control with various established treatments and drugs.

6. During this period of time, Jolee Mohr was prescribed Humira, a TNF inhibitor manufactured by defendant Abbott.

7. Prior to July 2007, Ms. Mohr appeared in excellent health despite her diagnosis and was active and mobile, and exhibited few serious signs of arthritis. She and her husband were loving parents of a five year old daughter.

8. During this period of time, Ms. Mohr considered Dr. Robert Trapp of Springfield, Illinois, as her trusted physician who acted solely in her best interest when treating her.

9. On or about February 2007, Dr. Trapp informed Ms. Mohr that he considered her to be a good candidate for a clinical trial sponsored by defendant TG titled "A Phase 1/2 Study of Repeat Intra-Articular Administration of tgAAC94, a Recombinant Adeno-Associated Vector Containing the TNFR:Fc Fusion Gene, in Inflammatory Arthritis Subjects with and without Concurrent TNF-alpha Antagonists" ("the experiment").

2

10. The experiment involved gene transfer in which subjects were injected with millions of particles of tgAAC94, a genetically modified virus called "adeno-associated virus" containing an Enbrel gene. Enbrel is also a TNF inhibitor. TgAAC94 was designed and manufactured by defendant Targeted Genetics.

11. Patients on a TNF inhibitor such as Humira should not be placed on any other TNF inhibitor such as Enbrel, because such combination can result in serious adverse reaction.

12. The experiment was a double blind, placebo-controlled, multicenter study sponsored and designed by defendant TG.

13. TG had contracted with WIRB to serve as the federally required IRB.

14. TG and WIRB designated and approved Dr. Trapp to serve as a Principal Investigator for the experiment conducted at his site, "The Arthritis Center."

15. The Protocol which governed the experiment, however, was designed and approved by TG and WIRB.

16. Because the experiment involved gene transfer, it had originally been presented to the Recombinant DNA Activities Committee, known as the "RAC," a federal advisory committee established by the National Institutes of Health.

17. When the RAC reviewed the Protocol in September 2003, it made, among other things, the following recommendations:

    a. "The roles of the treating physician for the patient and the investigator of the study should be clearly separated. This would help ensure that the patient's decision to forgo systemic therapy for persistence of disease in a single joint precedes or is separate from the decision to enroll in the study. When a researcher is also the personal physician of the patient, an independent third party should discuss the details of the study with the

3

patient and carry out the consent and enrollment processes with the potential research participant. These stipulations and the role of the third party should be clearly delineated in the protocol."

b.    "Consideration should be given to developing a test to assess how well potential research participants understand certain aspects of the study. Such a test could help determine whether a potential participant understands that the study's goal is to evaluate the safety of the study agent and that direct benefits are not expected; standard medications are available that may be effective for the treatment of the disease; and the study agent cannot be considered superior to currently available standard medications."

18.    Notwithstanding these recommendations to the contrary, TG and WIRB assigned Dr. Trapp the role of Principal Investigator and encouraged him to recruit and induce his longtime patients, such as Ms. Mohr, into enrolling in the experiment and convincing them it was in their best therapeutic interest to do so.

19.    During the recruitment process, Dr. Trapp represented to Ms. Mohr that the experiment was what he called "gene therapy," a phrase which by itself denotes that it is therapeutic and beneficial. In fact, "gene therapy" is a purely experimental procedure which, despite its promise, has been proven neither safe nor effective for any human disease or ailment.

20.    Dr. Trapp provided Ms. Mohr with a document titled "Research Subject Information and Consent Form," ("Consent Document"), a copy of which is attached as Exhibit "B." The Consent Form was drafted and approved by TG and WIRB.

21.    The Consent Form and the discussions with Dr. Trapp were fully authorized and promoted by TG and WIRB, and were materially misleading and deceptive in several respects, including:

4

a.     the procedure was not described as "a human experiment" and instead was represented to be therapeutic in nature;

b.     the risk of toxic effects of the injection of the virus vectors owned by TG was understated;

c.     there was no warning that the experiment presented a risk of death to human subjects;

d.     there was no warning that a prior gene therapy experiment, affiliated with a company subsequently purchased by TG, had resulted in the death of an 18 year old volunteer at the University of Pennsylvania;

e.     gene transfer was represented as a proven therapy and not an unproven and high risk procedure with consequences unknown to even the world's premier gene transfer scientists;

f.     the procedure was represented as safe and effective for the treatment of rheumatoid arthritis;

g.     there was no disclosure that prior animal studies revealed uncontrolled spread of the virus used in the gene transfer which could trigger an uncontrolled immune response; and

h.     the financial conflicts of interest inherent in the experiment were not disclosed.

22.     Induced by these misrepresentations and falsehoods, and believing that enrolling in the experiment was in her best therapeutic interest, Ms. Mohr agreed to participate.

23.     The experiment was unethical because it presented significant risk to Ms. Mohr with no benefit whatsoever.

5

24. Ms. Mohr, a mother of a young child and a loving wife, would never have agreed to participate in the experiment had she known it presented a risk of death, even if it offered a potential cure for her mild rheumatoid arthritis, which it did not.

25. Dr. Trapp injected Ms. Mohr on two separate occasions as part of the protocol designed and controlled by TG and WIRB.

26. On February 26, 2007, Ms. Mohr received her first injection, although it was not known whether she received the virus vector or placebo; Ms. Mohr suffered no ill effects from this injection nor did she discern any benefit.

27. On July 2, 2007, Dr. Trapp injected directly into Ms. Mohr's joint the virus vector manufactured and distributed by TG.

28. Almost immediately thereafter, Ms. Mohr began to experience nausea and pain; by the next afternoon she started vomiting and her temperature rose to 101 degrees. Although another patient injected by Dr. Trapp with the virus experienced the same acute symptoms after an injection, Dr. Trapp did not identify Ms. Mohr's reaction as being linked to the experiment and neither the FDA nor WIRB were notified of an adverse event.

29. By July 7, 2007, Ms. Mohr's temperature reached 104 degrees and she was admitted to the emergency room; when Dr. Trapp was notified, he advised again that this was not a reaction to the experiment and still did not report the event to the FDA or WIRB.

30. Ms. Mohr quickly deteriorated. By July 9, 2007, physicians at St. John's hospital in Springfield noted that her liver enzymes were elevated and that she had an elevated white blood count.

6

31. By July 18, 2007, Ms. Mohr was critically ill. Though conscious, she was suffering from liver and kidney failure, loss of blood and sepsis; she was transferred late that night to the University of Chicago in Cook County as a potential liver and kidney transplant.

32. By the time she arrived, all of Ms. Mohr's organs were failing; she was suffering from a severe internal hematoma; her body was full of infection, her immune system seemingly ceasing to function.

33. When the doctors at the University of Chicago learned Ms. Mohr had received gene transfer, they immediately suspected a connection between her condition and her participation in the experiment.

34. On July 19, 2007, physicians at the University of Chicago informed the FDA of a serious adverse event connected to a gene transfer trial.

35. Not until the next day, July 10, 2007, did TG inform the FDA that Ms. Mohr's critical condition was "possibly related" to the trial it was conducting at The Arthritis Center in Springfield.

36. The night of July 22, 2007, was the last night Ms. Mohr was conscious and the last time she was able to communicate with her husband.

37. On July 24, 2007, Ms. Mohr died as a direct and proximate result of her participation in the experiment, or as a result of the experimental drug combined with prior intake of Humira.

38. Thereafter, Ms. Mohr was autopsied at the University of Chicago Medical Center.

## COUNT I

### NEGLIGENCE vs. TARGETED GENETICS AND WIRB
(Survival Action)

39.     Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

40.     At all times mentioned herein and material hereto, TG and WIRB, and each of them respectively, jointly and severally, were charged with the professional responsibility of conducting an ethical experiment where risks did not greatly exceed benefits, of determining the universe of harm through proper preclinical animal studies, of properly conducting the informed consent process, of rendering proper care and treatment to Ms. Mohr, of properly and carefully examining her in order to determine her condition and eligibility for the experiment, of properly and carefully designing and administering the experiment's protocol in a careful and prudent fashion, and of assuring that proper care and attention were provided during all periods of time during which she remained under defendants' care and treatment.

41.     As a result of the careless, negligent and reckless conduct of the defendants, Ms. Mohr was caused to suffer excruciating and agonizing pain and discomfort.

42.     Defendants together, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel, medical assistants and employees were careless, negligent and reckless in:

a.     failing to conduct an ethical experiment in accordance with the standards and guidelines governing human subject research;

8

b. failing to determine the universe of harm through preclinical animal studies;

c. failing to properly conduct the informed consent process;

d. failing to properly and adequately evaluate Ms. Mohr's condition and eligibility for the experiment;

e. failing to properly and adequately treat her condition;

f. failing to properly and adequately care for her condition;

g. failing to provide and afford proper and careful care;

h. failing to perform proper and careful research practices and procedures in accordance with the standards prevailing in the community;

i. failing to properly care for her condition under all of the circumstances;

j. caring for Ms. Mohr in a negligent and improper manner;

k. failing to properly monitor her condition both prior to and subsequent to the delivery of the experiment's investigational drugs;

l. failing to inform Ms. Mohr of all the risks of the experiment so as to afford her with the opportunity to make an informed decision as to the injection of virus vectors;

m. failing to design, implement and monitor an experiment in accordance with the ethical standards for such experiments;

n. failing to remove Ms. Mohr from the experiment;

o. failing to warn Ms. Mohr regarding the danger of the virus vector; and

p. acting negligent per se.

43.     As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness and willful and wanton conduct of defendants, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel and employees, Ms. Mohr was caused to sustain serious and excruciating personal injuries which ultimately led to her death.

44.     She was caused to suffer agonizing aches, pains and mental anguish; she sustained loss of enjoyment of life and loss of life's pleasures, and she suffered dignitary harm.

45.     As a result of her injuries, she has been prevented from performing all of her usual duties, occupations, recreational activities and avocation all to her and her beneficiary's loss and detriment.

46.     By conducting themselves as described above, defendants increased the risk of harm, thereby causing the injuries to Ms. Mohr.

WHEREFORE, Plaintiff claims of Defendants, TG and WIRB, and each of them respectively, jointly and severally, damages in excess of Fifty Thousand Dollars ($50,000), plus · costs of suit.

## COUNT II

## WRONGFUL DEATH vs. TARGETED GENETICS AND WIRB

47.     As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries suffered, and are suffering for an indefinite period of time in the future, damages, injuries and losses, including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from Ms. Mohr, including

monies which Ms. Mohr would have provided for such items as clothing, shelter, food, medical care and education.

48.	As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries would have been, continue to be and will be in the future wrongfully deprived of large and various sums of money which Ms. Mohr would have contributed to their support.

49.	As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries incurred or have been caused to incur and paid large and various expenses various funeral, burial and estate administration.

50.	Plaintiff makes claim, on behalf of Ms. Mohr's heirs-at-law and next-of-kin, for the loss of love, affection, companionship, services, earnings, support and all other damages recoverable under the Wrongful Death Statute.

**WHEREFORE**, plaintiff claims of defendants, Targeted Genetics and WIRB, and each of them respectively, jointly and severally, compensatory damages in excess of Fifty Thousand Dollars ($50,000.00), plus costs of suit.

## COUNT III

### STRICT PRODUCTS LIABILITY vs. TARGETED GENETICS AND ABBOTT
### (Survival Action)

51.	Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

52.	Defendant TG designed and manufactured the virus vector.

53.	Defendant Abbott manufactured, distributed and sold Humira.

11

54.     Defendants breached their duties and obligations by various sections of the Restatement of Torts, 2d, including Section 402(a) and are liable for causing injuries and death to Ms. Mohr for the following reasons:

a.      designing, manufacturing, and/or distributing a product in a defective condition;

b.      designing, manufacturing, and/or distributing a product which was unreasonably dangerous;

c.      designing, manufacturing, and/or distributing a product which was not safe for normal use and consumption;

e.      failing to have adequate warnings on the product;

f.      designing, manufacturing, and/or distributing a product which could have been produced and manufactured more safely;

g.      designing, manufacturing, and/or distributing a product for which it was foreseeable that someone would be harmed by the product's use;

h.      designing, manufacturing, and/or distributing a product for which was not safe for its intended use;

i.      designing, manufacturing, and/or distributing a product which was lacking of one or more elements necessary to make it safe for its intended use;

j.      designing, manufacturing, and/or distributing a product which was defective and which could cause injury to the user;

k.      failing to properly monitor her condition both prior to and subsequent to the delivery of the experiment's investigational drugs;

l. failing to ensure that ultimate users were advised of the dangers of said product;

m. failing to exercise reasonable care in the design of this product;

n. failing to exercise reasonable care in the distribution of this product;

o. failing to adequately and properly test this product;

p. failing to use reasonable care under the circumstances;

q. producing a product which was defective and could cause injury to the user;

r. supplying a product which was defective and could cause injury to the user;

s. failing to adequately and properly test the product after its design and manufacture;

t. failing to investigate and analyze prior adverse reactions information in order to warn and/or notify ultimate users of the product defects and dangers;

u. violating applicable sections of the Restatement of Torts, 2d; and

v. engaging in other acts regarding the manufacturing, designing, testing, preparing, producing and distributing this product as will be learned in discovery.

55. As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness and willful and wanton conduct of defendants, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel and employees, Ms. Mohr was caused to sustain serious and excruciating personal injuries which ultimately led to her death.

56. She was caused to suffer agonizing aches, pains and mental anguish; she sustained loss of enjoyment of life and loss of life's pleasures, and she suffered dignitary harm.

57. As a result of her injuries, she has been prevented from performing all of her usual duties, occupations, recreational activities and avocation all to her and her beneficiary's loss and detriment.

58. By conducting themselves as described above, defendants increased the risk of harm, thereby causing the injuries to Ms. Mohr.

WHEREFORE, Plaintiff claims of Defendants, TG and Abbott, and each of them respectively, jointly and severally, damages in excess of Fifty Thousand Dollars ($50,000), plus costs of suit.

## COUNT IV

## WRONGFUL DEATH vs. TARGETED GENETICS AND ABBOTT

59. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries suffered, and are suffering for an indefinite period of time in the future, damages, injuries and losses, including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from Ms. Mohr, including monies which Ms. Mohr would have provided for such items as clothing, shelter, food, medical care and education.

60. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries would have been, continue to be and will be in the future wrongfully deprived of large and various sums of money which Ms. Mohr would have contributed to their support.

14

61.    As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries incurred or have been caused to incur and paid large and various expenses various funeral, burial and estate administration.

62.    Plaintiff makes claim, on behalf of Ms. Mohr's heirs-at-law and next-of-kin, for the loss of love, affection, companionship, services, earnings, support and all other damages recoverable under the Wrongful Death Statute.

**WHEREFORE**, plaintiff claims of defendants, Targeted Genetics and Abbott, and each of them respectively, jointly and severally, compensatory damages in excess of Fifty Thousand Dollars ($50,000.00), plus costs of suit.

DEPAEPE LAW OFFICE

DATE: _8-15-08_

BY: _____
Louis DePaepe
222 W. Market, P.O. Box 77
Taylorville, Illinois  62568

OF COUNSEL

SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY

BY: _____
Alan C. Milstein
4300 Haddonfield Road
Pennsauken, New Jersey  08109

Attorneys for plaintiff

15

IN RE THE ESTATE OF: )
)
JOLEE KAY MOHR, )
) Case No. 07-P- 6 1
Deceased. )

## LETTERS OF ADMINISTRATION

ROBBY JAY MOHR has been appointed Guardian of the estate of JOLEE KAY MOHR,

deceased, and is authorized to have under the direction of the Court the care, management,

investment and the custody of the Ward and to do all acts required of him by law.

Witness, **August 2** , 2007.

*Donna M. Castelli*
(Clerk of the Circuit Court)

(Seal of court)

## CERTIFICATE

I certify that this is a copy of the letters of office now in force in the estate.

Witness, _____,

(Seal of court)                    (Clerk of the Circuit Court)

**FILED**

AUG 0 2 2007

*Donna M. Castelli*
Circuit Clerk
Christian County

Exhibit A

Ridl Weiss
202-496-3883

Jolee Mohr Info

217-564-2125

APPROVED
AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

# RESEARCH SUBJECT INFORMATION AND CONSENT FORM

**TITLE:**  A Phase 1/2 Study of Repeat Intra-Articular Administration of tgAAC94, a Recombinant Adeno-Associated Vector Containing the TNFR:Fc Fusion Gene, in Inflammatory Arthritis Subjects with and without Concurrent TNF-alpha Antagonists

**PROTOCOL NO.:**  13G01
WIRB® Protocol #20051202

**SPONSOR:**  Targeted Genetics Corporation
Seattle, Washington
United States

**INVESTIGATOR:**  Robert G. Trapp, M.D.
2528 Farragut Drive
Springfield, Illinois 62704
United States

**SITE(S):**  The Arthritis Center
2528 Farragut Drive
Springfield, Illinois 62704
United States

**STUDY-RELATED PHONE NUMBER(S):**  Robert G. Trapp, M.D.
217-546-6888 (24 Hours)

## Introduction

This consent form may contain words that you do not understand. Please ask the study doctor or the study staff to explain any words or information that you do not clearly understand. You may take home an unsigned copy of this consent form to think about or discuss with family or friends before making your decision.

You are being asked to take part in the clinical research study named above because you have inflammatory arthritis (pain and swelling of the joints - rheumatoid arthritis, psoriatic arthritis or ankylosing spondylitis). You have the right to know about the procedures, risks, hazards, discomforts, and possible benefits of this study to help you make an informed decision about whether or not you will volunteer to participate in the study. Please read the information below and ask questions about anything you don't understand before deciding whether or not to take part.

Exhibit B

APPROVED
AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

Your participation in this research study is voluntary. You are free to withdraw your consent to participate or may refuse to participate at any time. This means that you can stop participation or refuse to participate for any reason, without penalty or loss of benefits that you are otherwise entitled to. Withdrawal or refusal will not affect your medical care or other available treatments for your inflammatory arthritis. If you withdraw or refuse to participate, it will not affect your participation in other clinical studies.

About 120 volunteers will take part in this clinical research study. The study is taking place at research sites in the United States.

## Purpose of this study

The purpose of this study is to find out if repeat injections of the investigational gene transfer agent tgAAC94 (study agent) to a single joint are safe. An investigational agent is one which has not been approved by the U.S. Food and Drug Administration (FDA). It is not known if gene transfer will work in people with inflammatory arthritis. In this study tgAAC94 will be given to subjects who do and do not also use approved TNF-α blockers such as etanercept (Enbrel®), infliximab (Remicade®) and adalimumab (Humira®).

## Study Agent

Gene transfer is an experimental procedure that introduces a gene coding for a protein directly into cells in the body. The body can then use the gene to make the protein. However, genes cannot be introduced inside the cell without help. In the case of tgAAC94, a small and simple virus called adeno-associated virus (AAV) has been modified to contain the gene coding for the TNFR:Fc protein, which is the same as the medication called etanercept or Enbrel®. However, Enbrel® does not contain the gene, only the protein. AAV infects many people in everyday life, but does not cause disease in humans. Although tgAAC94 was modified from AAV, tgAAC94 cannot grow in your body because all the AAV genes, including those that it needs to grow, have been removed.

By injecting tgAAC94 directly into an affected joint in your body (called the target joint), we hope it will help the body make a protein that stops the inflammatory process and reduces the progressive joint destruction and resulting disabilities associated with inflammatory arthritis.

## Selection of study subjects

- You must not have tested positive for HIV, tuberculosis (unless adequately treated), hepatitis B or hepatitis C.
- If you are a female, you must not be pregnant or breast-feeding and you must be willing to practice effective birth control measures during your participation in the study.
- If you are a male, you should not father a child and you must be willing to practice effective birth control measures during your participation in the study.
- There may be other reasons you may not participate in the study. Your study doctor will discuss these reasons with you.

APPROVED
AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

## Study Setup

The study is divided into six groups called "cohorts". The dosage of study agent you receive will depend on which cohort you are in. The first three cohorts are known as "dose-escalation." This means that subjects enrolled into the second cohort will receive a higher dosage of study agent than subjects enrolled into the first cohort, and subjects enrolled in the third cohort will receive a higher dosage of study agent than subjects enrolled into the second cohort. Cohorts four, five and six will be enrolled simultaneously (at the same time). Subjects enrolled in cohort four will receive the same dosage as subjects in cohort one. Subjects enrolled in cohort five will receive the same dosage as subjects in cohort two. Subjects in cohort six will receive the same dosage as subjects in cohort three. Each of the six cohorts will have 20 subjects and will be divided into two parts: Segment A and Segment B.

If you qualify for the study at screening and wish to participate, your research doctor will determine which eligible joint (knee, ankle, elbow, wrist or knuckle) will be targeted for injection. In Segment A, you will be randomly (by chance) assigned to receive either study agent or placebo. The placebo looks like the study agent, but does not contain tgAAC94. There is a three out of four chance that you will get the study agent and a one out of four chance that you will get the placebo. Segment A is called "double-blind". This means that neither you nor the research doctors and nurses will know if you have been given the study agent or the placebo.

Information about whether you receive study agent or placebo will be kept secret (blinded) in a locked file at Targeted Genetics Corporation. In a medical emergency, this information may be revealed (unblinded) to the research doctor to make decisions about your medical care. It may also be revealed to the Data Monitoring Committee, which is an external group that oversees the research study.

Once your research doctor determines that you are eligible to receive a second injection (no sooner than 12 weeks after receiving your first injection but no longer than 30 weeks), you will be enrolled into Segment B of the study. Segment B is called "open-label", which means you and the research doctors and nurses know that you will receive study agent. In Segment B, you will receive an injection of study agent at the same dose concentration as the first injection for your cohort. The injection will be given in the same joint that was injected in Segment A.

## How long will the study last?

The screening process may take up to two weeks. Segment A of the study may last between 12 and 30 weeks depending on when you become eligible to receive a second injection. Segment B will last about 30 weeks. Including screening, the total length of your participation will be between 44 and 62 weeks (10 and 15 months). The total number of study visits may range from 14 to 16.

## Study Procedures

If you agree to participate, you will sign this informed consent form. You will be given a copy of this consent form to keep. The original will be kept by your research doctor.

APPROVED
AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

Day -14 (Screening)

- You will sign the informed consent form, (if not already done).
- You will have a medical examination, including physical exam and vital signs (vital signs are pulse, breathing rate, blood pressure and temperature), and be asked questions about your general health and any medications you currently take or have taken in the past four weeks.
- Your study doctor will examine your eligible joints and determine which joint is to be injected.
- You will be asked to provide a blood sample (about 2 to 3 tablespoons).
- You will be asked to provide a urine specimen.
- You will have a PPD test (a test to see if you have been exposed to tuberculosis). If it is positive you may need to have additional tests to confirm whether or not you have active tuberculosis. If you do, it will have to be reported as required by law.
- You will have an electrocardiogram (ECG or EKG - tracing of the electrical activity of the heart) and a chest x-ray.
- If you are a woman capable of becoming pregnant, you must have a urine pregnancy test.

Study Visit Schedule

If you qualify at screening, you will be asked to return to the research clinic within 14 days to be injected with either study agent or placebo (Segment A - Day 0). You will then be asked to complete additional study visits based on the following schedule:

| Study Visit/ Segment | Day 0 | Day 3 | Day 7 | Week 4 | Week 8 | Week 12 | Week 18 | Week 24 | Week 30 | USV | EW |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Segment A | X | • | X | X | X | X | X | X | X | USV | EW |
| Segment B | X | • | X | X | X | X | X | X | X | USV | EW |

X =  Study visit is required

X =  Study visit is not necessary if target joint is eligible for second injection at or before that visit.

• =  Phone contact

USV= Unscheduled Visit: only required to assess possible injection site reaction or worsening of target joint.

EW = Early Withdrawal visit: only required if study participation is stopped early after receiving an injection.

At each study visit (during both Segment A and B) the following procedures will be conducted:

APPROVED
AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

### Day 0 (Injection Visit)

- You will have a medical examination, including physical exam and vital signs, and be asked questions about your general health and any changes in medications since your previous study visit.
- Your research doctor will examine the target joint.
- You will be asked to provide a blood sample (about 2 to 3 tablespoons).
- You will be asked to provide a urine specimen.
- You will complete questionnaires about your overall disease activity, pain and disability associated with your inflammatory arthritis (if you have ankylosing spondylitis, you will also be asked to complete the Bath Ankylosing Spondylitis Functional Index and the Bath Ankylosing Spondylitis Disease Activity Index).
- Your research doctor will conduct a count of your tender and swollen joints and complete a global assessment of your inflammatory arthritis.
- Your height and weight will be measured.
- If you are a woman you will have a urine pregnancy test.
- If fluid is present in your target joint, your research doctor will remove the fluid (if possible) with a needle and syringe.
- You will have your target joint injected (with study agent or placebo if Segment A; with study agent if Segment B).
- After your target joint is injected, you will be asked to remain in the clinic for one hour to monitor you for any side effects.

About three days after completing the Day 0 (injection) visit, you will be contacted by your research doctor, or designated research personnel, and asked questions about your general health and any changes in medications since your injection. If you have symptoms (like increased swelling of the injected joint) that sound like an injection site reaction, you will be asked to return to the research site for an unscheduled visit.

### Day 7

- You will have a medical examination, including physical exam and vital signs, and be asked questions about your general health and any changes in medications since your previous study visit.
- Your research doctor will examine the target joint.
- You will be asked to provide a blood sample (about 2 teaspoons), if Segment A and you are one of the first ten subjects enrolled in cohorts two or three.
- You will complete a global, pain and disability assessment of your inflammatory arthritis if you are enrolled in cohorts four, five or six.

(20 Ju 05)

AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

Week 4, Week 8, Week 12, Week 18, Week 24, and Week 30

- You will have a medical examination, including physical exam and vital signs, and be asked questions about your general health and any changes in medications since your previous study visit.
- Your research doctor will examine the target joint.
- You will be asked to provide a blood sample (about 2 to 3 tablespoons).
- You will complete a global, pain and disability assessment of your inflammatory arthritis (if you have ankylosing spondylitis, you will also be asked to complete the Bath Ankylosing Spondylitis Functional Index and the Bath Ankylosing Spondylitis Disease Activity Index).
- Your research doctor will conduct a count of your tender and swollen joints and complete a global assessment of your inflammatory arthritis.
- If fluid is present in your target joint, your research doctor will remove the fluid (if possible) with a needle and syringe. (Week 4, Week 12 and Week 24 only).
- You will be asked to provide a urine specimen (Week 4 and Week 30 only).
- You will be weighed (Week 12, Week 24 and Week 30 only).
- If you are a woman capable of becoming pregnant, you will have a blood or urine pregnancy test (Week 30 only).
- You will have a chest x-ray (Week 30 only).

At the Week 12, Week 18, and Week 24 visits of Segment A, your research doctor will examine your target joint and decide if it is eligible for the second injection. If so, the remaining procedures for that visit will not be performed, and you will be asked to return for the Day 0 visit of Segment B within 14 days to have the second injection, which will be study agent (tgAAC94). If your target joint does not become eligible for a second injection prior to Week 30 of Segment A, you will automatically switch to Segment B and receive the second injection at the week 30 visit.

Unscheduled Visits

You may be asked to return for an unscheduled visit if you develop symptoms that sound like an injection site reaction or flare (worsening) of the target joint. If so, the following procedures will be performed:

- You will have a medical examination, including physical exam and vital signs, and be asked questions about your general health and any changes in medications since your previous study visit.
- You will be weighed
- Your research doctor will examine the target joint.
- Your research doctor will conduct a count of your tender and swollen joints.

AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

If your research doctor determines that you have a flare of the target joint and are eligible for a second injection, you will be asked to return for the Day 0 visit of Segment B within 14 days. If your research doctor determines that you have a possible injection site reaction, the following procedures will be performed at the unscheduled visit:

- You will be asked to provide a blood sample (about 2 to 3 tablespoons).
- You will complete a global, pain and disability assessment of your inflammatory arthritis if you are enrolled in cohorts four, five or six.
- If fluid is present in your target joint, your research doctor will remove the fluid (if possible) with a needle and syringe.

If your research doctor suspects that you have an injection site reaction at a regularly-scheduled visit, the above evaluations will be performed, if they are not already part of that study visit.

## Long-Term Follow-up

This study involves gene transfer. The U.S. federal government has established strict requirements for gene transfer studies. One of the requirements is that if you receive tgAAC94, you will be expected to cooperate in long-term follow-up after study agent administration. Long-term follow-up after the last injection of study agent will consist of annual contact by telephone for two years. You will be asked to provide a list of persons to contact in case you cannot be reached. If you move, you will be asked to provide your new address and telephone number to your research doctor. Your research doctor or a member of his/her staff will contact you once a year by telephone during the two-year follow-up to ask questions about any hospitalizations and new medical conditions you may have had. This is important to determine if there are any long-term consequences of receiving a gene transfer agent.

To fully evaluate the effects and safety of gene transfer, it is necessary to obtain as much information as possible. If you die, no matter what the cause, evaluating your organs by autopsy might be very helpful in understanding the full effects of gene transfer, if there are any. In order to comply with the National Institutes of Health (NIH) requirements of gene transfer studies, if your research doctor learns of your death within 24 hours of the event, then an autopsy will be requested from your family or next-of-kin. By participating in this study, you are granting your research doctor permission to make this request of your family, but this does not mean that you are giving permission for an autopsy. However, you are encouraged to discuss this with your family in advance.

## Risks, Hazards and Discomforts

## Risks Associated with tgAAC94 (study agent)

The risks associated with tgAAC94 can be divided into (1) the risks associated with the gene that is transferred to the body and the protein for which it codes, and (2) the risks associated with the AAV used to introduce the gene into the body.

The gene that is transferred to the body codes for a protein that is the same as the approved medication called etanercept or Enbrel®. Etanercept has been given by an injection under the skin to many people with inflammatory arthritis with remarkable improvement in their symptoms. It has been given directly into the joint of a small number of people with inflammatory arthritis with some improvement in the symptoms, but in one case, there was increased swelling of the joint. It is not known if the risks of giving the gene coding for the protein directly into the joint will be the same as giving etanercept itself. The risk of giving injections of tgAAC94 into the joints of people who are taking other TNF blockers like infliximab, (Remicade®) and adalimumab (Humira®) is unknown.

Side effects (or negative symptoms) associated with injection of etanercept under the skin include serious bacterial infections, especially if you also have diabetes, reactivation of tuberculosis, demyelinating symptoms (like those associated with multiple sclerosis) and lupus-like reactions. These serious adverse (bad or harmful) effects occur in about 10% of patients who receive etanercept. Other reported side effects are seizures, inflammation of the nerves, fever, bruising, serious blood disorders and paleness. These side effects could be possible with the use of tgAAC94.

Targeted Genetics Corporation has used AAV to introduce genes into over 220 people. These included about 140 subjects with a genetic disorder called cystic fibrosis (CF) who received doses of a similar AAV vector into the nose, maxillary sinus and lung, and about 65 healthy volunteers who received an injection of a similar vector into the muscle in an HIV vaccine study. Some subjects administered the highest doses developed an immune response. This immune response consisted of elevated proteins that interact with AAV in the blood. No side effects related to the development of this immune response have been noted so far. We do not know if the same immune response will develop after injection of tgAAC94. It is possible that this type of immune response will make additional injections of tgAAC94 or other AAV vectors in the future difficult or impossible.

A single dose of tgAAC94 has been injected into the joints of both rats and monkeys without raising any safety concerns. A single dose of a different AAV vector, containing the rat version of TNFR:Fc, has also been injected into the joints of rats with arthritis without causing any problems. The arthritis in these rats seemed to improve. A single injection of tgAAC94 has been given to the joint of approximately 10 humans in another study of tgAAC94 without raising any safety concerns.

Repeat injections of tgAAC94 into joints have been given to rats once a month for three months. After the second injection of tgAAC94, approximately 20% of the rats developed mild swelling in the joint that resolved after a few days. It is possible that you may develop increased swelling of the joint after you receive the second dose of tgAAC94. If the swelling is severe, you may be treated with an injection of steroid into the joint to help reduce the symptoms. However, if you receive an injection of steroids into the target joint, you will be withdrawn from the study.

APPROVED
AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

Another possible consequence is that tgAAC94 could spread to other parts of your body. The risks of this are not known at this time. We have seen this type of spread in animal studies when tgAAC94 has been given by injection into the joint.

There is a very small chance that the tgAAC94 could damage the DNA in the cells of your body by inserting itself into your genes. If this happened, it could put you at risk for developing cancer in the future.

The U.S. Food and Drug Administration (FDA), which oversees clinical studies of investigational drugs in the United States, was made aware of an animal study where a number of newborn diseased mice injected with very high doses of an AAV vector developed liver tumors. This was a research study using an AAV vector that was not designed or produced for human use. The vector used for the mouse study did not contain the TNFR:Fc gene and it was not designed to treat inflammatory arthritis. Tumors have not been observed in other similar studies of different types of mice injected with higher doses of AAV vectors and watched for over a year. There have been no reports of tumors in the limited number of human subjects who have received an AAV vector. Tumors have not been reported in any other animal studies of AAV vectors, but the number of studies that have been done so far is small. It seems unlikely that the tumors are linked to the AAV vector, but we do not know for sure.

Since we do not know what tgAAC94 will do to an embryo or fetus, females who might be able to become pregnant must not be pregnant while in the study. Any female of childbearing potential who joins the study will have a pregnancy test before she receives the tgAAC94 or placebo. Both males and females who join this study must agree to use effective birth-control during the entire study, as we do not know what the study agent could do to a developing baby. Effective forms of birth control include hormonal therapies (for example, the pill), barrier methods (for example, condoms with spermicide), IUD, surgically sterility (for example, a hysterectomy or vasectomy) or menopause (for at least one year). If you become pregnant, suspect that you became pregnant, or impregnate someone while on the study, you must notify your research doctor immediately. If you are pregnant and are scheduled to receive study agent or placebo, you will be immediately withdrawn from the study.

There may be other not-yet-identified side effects that could occur during the time you participate in the study or years after receiving the study agent. Unknown side effects could be mild, serious or life threatening, and could result in pain, discomfort, disability or, in rare circumstances, death.

## Risks and Discomforts Associated with Study Procedures

Blood samples are taken by putting a needle into your vein, which can cause pain, bruising, and, rarely, infection. Removal of fluid from the joint can also cause temporary local pain, bruising, and rarely, infection. As with any injection into the joint, subjects may experience pain, tenderness, redness, discoloration or bruising at the site of injection. The risk of infection is small, but you could get one from these procedures. You will receive a small amount of

AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

radiation from the chest x-ray. However, this amount is too low to be measured directly and is considered to be comparable to receiving several weeks of natural background radiation exposure, which most people in the United States receive each year.

You will be watched and treated for any complications during and after the procedures. Your research doctor and nurses will monitor your disease status and check for side effects with blood tests and physical examinations.

Your condition may not get better or may become worse during this study.

Research studies involving gene transfer have received a great deal of attention from the media. Although every effort will be made to protect your identity and that of your family, this attention may result in a greater risk than usual that information concerning your study participation will appear publicly without your consent.

## New Findings

You will be notified if there are any significant new side effects or information that might change your decision to be in the study.

## Potential Benefits

We do not expect you to receive any direct medical benefit from participation in this study.

Because you are in this study, you will undergo more frequent monitoring of your inflammatory arthritis, which may give additional information to you and your research doctor about the progress of your disease. It is possible that this extra monitoring and testing could improve your health while you are in the study, but we do not know if this will happen.

The results of this study may give Targeted Genetics Corporation and the research doctors more information to use in the next step of developing a gene transfer agent for inflammatory arthritis.

## Costs of the Study

Neither you nor your insurance company will be charged for any tests or procedures that are done for the purposes of the research study. Study agent will be provided without charge by Targeted Genetics Corporation, the sponsoring company.

You or your insurance company will be billed for costs of tests or procedures that are part of your routine medical care.

## Compensation

You will not be paid for your participation in this study.

## Alternative Therapy

An alternative to administration of the tgAAC94 or placebo is the current standard treatment available to patients with rheumatoid arthritis, psoriatic arthritis or ankylosing spondylitis at The Arthritis Center. Your research doctor will discuss this treatment with you during the consent process.

## Voluntary Participation/Withdrawal

Your participation in this study is voluntary. You may choose not to participate or withdraw your consent to participate in this study without penalty or loss of benefits to which you are entitled. You should notify your research doctor as soon as possible if you decide to withdraw your consent. Your research doctor or Targeted Genetics Corporation may also decide to stop this clinical study for either medical or administrative reasons at any time and without your consent. This could happen if the research is not beneficial, an unexpected harmful side effect of the study agent is found or the study resources are no longer available.

If you discontinue the study early (after Day 0 but before Week 30 in either Segment) for any reason, you will be asked to return to the clinic for one or more safety checkups. The procedures and assessments completed at the Early Withdrawal visit will be the same as those that are completed for the Week 30 visit. Regardless of the reason for your discontinuing the study, clinical information relevant to this research study will continue to be collected. This includes information about study-related injuries and long-term follow-up.

If you develop a severe side effect, like increased swelling of your target joint that your research doctor thinks is due to the study drug, you may not qualify to receive the second injection of open-label study drug. In such a case, your research doctor will ask you to return for study visits until the time of the second injection (Week 30 of Segment A); then you will be withdrawn from the study. If you have already received a second injection of study drug and your research doctor thinks you have a severe side effect due to the study drug, you will be asked to complete the study through Week 30 of Segment B.

## Compensation for Injury

If you are injured as a direct result of participating in this study, medical treatment for immediate complications will be provided to you without charge. This does not constitute a waiver of any rights you may have under federal or state laws and regulations.

## Source of Funding

Funding for this research study will be provided by Targeted Genetics Corporation.

AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

# AUTHORIZATION TO USE AND DISCLOSE INFORMATION FOR RESEARCH PURPOSES

Federal regulations give you certain rights related to your health information. These include the right to know who will be able to get the information and why they may be able to get it. The research doctor must get your authorization (permission) to use or give out any health information that might identify you.

**What information may be used and given to others?**
If you choose to be in this study, the research doctor will get personal information about you. This may include information that might identify you. The research doctor may also get information about your health including:

- Past and present medical records
- Research records
- Records about phone calls made as part of this research
- Records about your study visits
- Information obtained during this research about
    Other reportable infectious diseases
    Physical exams
    Laboratory, x-ray, and other test results
    Questionnaires
- Records about any study agent you received

**Who may use and give out information about you?**
Information about your health may be used and given to others by the research doctor and staff. They might see the research information during and after the study.

**Who might get this information?**
Your information may be given to the sponsor of this research. "Sponsor" includes any persons or companies that are working for or with the sponsor, or are owned by the sponsor. For this study, "sponsor" also includes AXIO Research Corporation, an agent for the sponsor.

Information about you and your health which might identify you may be given to:

- The U.S. Food and Drug Administration (FDA)
- Department of Health and Human Services (DHHS) agencies
- Governmental agencies in other countries
- Governmental agencies to whom certain diseases (reportable diseases) must be reported
- The Western Institutional Review Board® (WIRB®)

**Why will this information be used and/or given to others?**
Information about you and your health that might identify you may be given to others to carry out the research study. The sponsor will analyze and evaluate the results of the study. In addition, people from the sponsor and its consultants will be visiting the research site. They will follow how the study is done, and they will be reviewing your information for this purpose.

APPROVED
AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

The information may be given to the FDA. It may also be given to governmental agencies in other countries. This is done so the sponsor can receive marketing approval for new products resulting from this research. The information may also be used to meet the reporting requirements of governmental agencies.

The results of this research may be published in scientific journals or presented at medical meetings, but your identity will not be disclosed.

The information may be reviewed by WIRB®. WIRB is a group of people who perform independent review of research as required by regulations.

**What if I decide not to give permission to use and give out my health information?**
By signing this consent form, you are giving permission to use and give out the health information listed above for the purposes described above. If you refuse to give permission, you will not be able to be in this research.

**May I review or copy the information obtained from me or created about me?**
You have the right to review and copy your health information. However, if you decide to be in this study and sign this permission form, you will not be allowed to look at or copy your information until after the research is completed.

**May I withdraw or revoke (cancel) my permission?**
Yes, but this permission will not stop automatically.

You may withdraw or take away your permission to use and disclose your health information at any time. You do this by sending written notice to the research doctor. If you withdraw your permission, you will not be able to continue being in this study.

When you withdraw your permission, no new health information which might identify you will be gathered after that date. Information that has already been gathered may still be used and given to others. This would be done if it were necessary for the research to be reliable.

**Is my health information protected after it has been given to others?**
If you give permission to give your identifiable health information to a person or business, the information may no longer be protected. There is a risk that your information will be released to others without your permission.

Because the study involves gene transfer, safety information is required to be reported to the Recombinant DNA Advisory Committee (RAC) of the National Institutes of Health. No information by which you can be identified will be reported with the safety information. This safety information is available to the general public. In addition, the media (TV, newspaper, radio, Internet, etc.) may have an interest in the study. The Arthritis Center and Targeted Genetics Corporation will make every reasonable effort to protect your privacy and will not divulge private/specific medical information without your consent.

**End of Study**

At the end of the study, the results will be analyzed. If you wish, your research doctor can tell you the results and whether you received the study agent or placebo as your first injection.

**Questions**

If at any time you have any questions related to the study, or if you believe you have experienced a research-related injury, you can contact:

Robert G. Trapp, M.D. at 217-546-6888 (24 Hours).

If you have any questions concerning your rights as a study subject, you may contact:

Western Institutional Review Board® (WIRB®)
3535 Seventh Avenue, SW
Olympia, Washington 98502
Telephone: 1-800-562-4789 or 360-252-2500
E-mail: ClientServices@wirb.com

WIRB is a group of people who perform independent review of research.

Do not sign this consent form unless you have had a chance to ask questions and have received satisfactory answers to all of your questions.

If you agree to be in this study, a copy of your signed and dated consent form will be given to you.

**Consent**

I have read this consent form, and all my questions have been answered. My signature indicates that I give my consent to participate in this study.

I authorize the use and disclosure of my health information to the parties listed in the authorization section of this consent for the purposes described above.

By signing this consent form, I have not given up any of my legal rights.

_____        _____
Signature of Subject                      Date

_____
Printed Name of Subject

AS CORRECTED
May 08, 2006
WIRB®
Olympia, WA

The contents of this consent form were verbally presented to the subject and all questions were answered completely.

_____                    _____

Signature of Witness (if required)                          Date

_____

Printed Name of Witness (if required)

_____                    __2/12/07__

Signature of Person Conducting Informed Consent Discussion     Date

_____

Printed Name of Person Conducting Informed Consent Discussion

# IN THE CIRCUIT COURT OF THE FOURTH JUDICAL CIRCUIT
## CHRISTIAN COUNTY, ILLINOIS

Robby Mohr, as Administrator of Estate of Jolee Mohr, )
)
)
        Plaintiff )
)
     vs. )
)   Case No. 08-L-31
Targeted Genetics, Inc., )
)
       and )
) **FILED**
Abbot Laboratories, Inc., )
)  AUG 1 5 2008
       and )
)  Donna M. Castelli
Western Institutional Review Board, Inc. )  Circuit Clerk
)  Christian County
      Defendants. )

## AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222

Now comes, Louis A. DePaepe, who under oath deposes and states as follows:

1. That my name is Louis A. DePaepe, and I am one of the Attorneys for Plaintiff in the above-referenced cause.

2. That I believe the damages in the above-referenced case can fairly be computed in an amount in excess of Fifty Thousand Dollars ($50,000.00).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

By: _____
      Louis A. DePaepe

Subscribed and sworn to before me this 15th day of August, 2008.

_____
Notary Public

OFFICIAL SEAL
DUSTI L ODAM
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/28/11

# IN THE CIRCUIT COURT OF THE FOURTH JUDICAL CIRCUIT
## CHRISTIAN COUNTY, ILLINOIS

|  |  |
|---|---|
| Robby Mohr, as Administrator of Estate of Jolee Mohr, <br><br> Plaintiff <br><br> vs. <br><br> Targeted Genetics, Inc., <br><br> and <br><br> Abbot Laboratories, Inc., <br><br> and <br><br> Western Institutional Review Board, Inc. <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 08-L-31

**FILED**

AUG 1 5 2008

*Donna M. Castelli*
Circuit Clerk
Christian County

## MOTION TO ALLOW ALAN C. MILSTEIN TO PARTICIPATE IN THIS CASE, PRO HAC VICE, PURSUANT TO SUPREME COURT RULE 707

Now comes Louis A. DePaepe, on behalf of Robby Mohr, as Administrator of the Estate of Jolee Mohr, and brings this Motion pursuant to Supreme Court Rule 707 and states as follows:

1.    Alan C. Milstein is an attorney in good standing licensed to practice law in the State of New Jersey.

2.    A certified copy of a Certificate of Good Standing from the Supreme Court of New Jersey is attached hereto as Exhibit A.

3.    That Alan Milstein is familiar with the issues in this cause and has from time to time advised Robby Mohr and the undersigned counsel on the issues in this cause.

4.    That Robby Mohr desires that Alan Milstein be admitted to act as co-counsel in this cause and that Alan Milstein is willing to participate as co-counsel.

WHEREFORE, Plaintiff, Robby Mohr, prays that this Honorable Court enter an order

allowing Alan C. Milstein to participate as co-counsel in this cause.

ROBBY MOHR, Plaintiff, by and through
his attorney, Louis A. DePaepe

By: _Louis A. DePaepe_

Louis A. DePaepe, Reg#6208032
DePaepe Law Office
222 W. Market
P.O. Box 77
Taylorville, IL 62568
(217) 824-2104

# Supreme Court of New Jersey



# Certificate of Good Standing

This is to certify that **ALAN C MILSTEIN** (No. **044021992** ) was constituted and appointed an Attorney at Law of New Jersey on **December 22, 1992** and, as such, has been admitted to practice before the Supreme Court and all other courts of this State as an Attorney at Law, according to its laws, rules, and customs.

I further certify that as of this date, the above-named is an Attorney at Law in Good Standing. For the purpose of this Certificate, an attorney is in "Good Standing" if the Court's records reflect that the attorney: 1) is current with all assessments imposed as a part of the filing of the annual Attorney Registration Statement, including, but not limited to, all obligations to the New Jersey Lawyers' Fund for Client Protection; 2) is not suspended or disbarred from the practice of law; 3) has not resigned from the Bar of this State; and 4) has not been transferred to Disability Inactive status pursuant to Rule 1:20-12.

*Please note that this Certificate does not constitute confirmation of an attorney's satisfaction of the administrative requirements of Rule 1:21-1(a) for eligibility to practice law in this State.*



In testimony whereof, I have hereunto set my hand and affixed the Seal of the Supreme Court, at Trenton, this 5TH day of **August** , 20 **08**

Clerk of the Supreme Court

EXHIBIT
A

# IN THE CIRCUIT COURT OF THE FOURTH JUDICAL CIRCUIT
## CHRISTIAN COUNTY, ILLINOIS

Robby Mohr, as Administrator of Estate    )
of Jolee Mohr,    )
    )
        Plaintiff    )
    )
    vs.    )
    )    Case No. 08-L-31
Targeted Genetics, Inc.,    )
    )
    and    )
    )
Abbot Laboratories, Inc.,    )
    )
    and    )
    )
Western Institutional Review Board, Inc.    )
    )
    Defendants.    )

FILED

AUG 18 2008

Donna M. Castelli
Circuit Clerk
Christian County

## ORDER

This cause comes before the Court a Motion to Allow Alan C. Milstein, Pro Hac Vice, to Participate as Co-Counsel in this Cause Pursuant to Supreme Court Rule 707; the Court having examined the contents of the Motion and the Certificate of Good Standing submitted by plaintiff, and otherwise being fully advised in the premises, orders as follows:

1.    Alan C. Milstein, through his firm, Sherman, Silverstein, Kohl, Rose & Podolsky is hereby admitted to practice before this Court in all aspects of this cause.

2.    In issuing this limited admission, that said Alan C. Milstein shall be required to perform his duties in accord with Illinois Supreme Court Rules and said admission shall be contingent upon serving with co-counsel licensed to practice in the State of Illinois.

3.    This limited admission is contingent upon Alan C. Milstein maintaining a Certificate of Good Standing in the State of New Jersey at all times he serves as co-counsel in this matter, unless this Order is otherwise modified by this Court upon written motion and order.

IT IS SO ORDERED.

_____
Honorable Presiding Judge
Christian County Circuit Court

FILED

AUG 1 8 2008

Donna M. Castelli
Circuit Clerk
Christian County

State of Illinois

In the Cir          Court of Judicial Circuit #04

County of CHRISTIAN

**FILED**

APR – 3 2009

*Julie J. Mayer*
Circuit Clerk, Christian County

MOHR, ROBBY AS ADM OF EST JOLEE MOH (P )( 1)
VS.                                              } Case No. 2008L 000031
TARGETED GENETICS, INC (ET AL)     (D )( 1)

Notice to DEPAEPE LAW OFFICE                                    00000-0000

The above-entitled case is set for Status hearing     on May     19, 2009 at 11:00 A.M.

in the Circuit Court, Courthouse
        PO BOX 617
        TAYLORVILLE        IL 62568-0000

This notice issued on April     03, 2009.

Judge: PAISLEY

Circuit Clerk JULIE J MAYER

Deputy

FILE COPY                                                         BB

3005827-GEA/MCF/BMW

# IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
## OF CHRISTIAN COUNTY, ILLINOIS

Robby Mohr, as Administrator of the Estate of )
Jolee Mohr, )
                             )
           Plaintiff, )
                             )
    v. )    No. 08-L-31
                             )
Targeted Genetics, Inc., et. al. )
                             )
           Defendants. )

**FILED**

MAY – 6 2009

*Julie J. Mayer*
Circuit Clerk, Christian County

## NOTICE OF FILING

To:    Louis A. DePaepe, 222 W. Market, P.O. Box 77, Taylorville, IL 62568

       PLEASE TAKE NOTICE that on May 4, 2009, we filed with the Circuit Court of the Fourth Judicial Circuit of Christian County, Illinois, Defendant Targeted Genetics, Inc.'s Appearance and Jury Demand and Answer to Plaintiff's Complaint, copies of which are attached hereto and are hereby served upon you.

                         SmithAmundsen LLC

               By:    _____
                            Attorney for Defendant

Glen E. Amundsen
Margaret C. Firnstein
SmithAmundsen LLC
150 N. Michigan Avenue
Suite 3300
Chicago, IL 60601
(312) 894-3200
(312) 894-3210 – Fax

## PROOF OF SERVICE

       The undersigned, a non-attorney, certifies that she sent a copy of this Notice and attached document(s) to the attorney(s) listed above by depositing the same in the U.S. mail at 150 N. Michigan Avenue, Chicago, Illinois, before 5:00 p.m. this ____ day of _____, 2009. Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

3005827-GEA/MCF/BMW

# IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
## OF CHRISTIAN COUNTY, ILLINOIS

Robby Mohr, as Administrator of the Estate of )
Jolee Mohr, )
                )
           Plaintiff, )
                )
    v.                )   No. 08-L-31
                )
Targeted Genetics, Inc., et. al., )
                )
           Defendants. )

**FILED**

MAY ~ 6 2009

*Julie J. Mayer*
Circuit Clerk, Christian County

## APPPEARANCE AND JURY DEMAND

    The undersigned, as attorney, enters the appearance and jury demand of

Defendant, Targeted Genetics, Inc.

    **\*Defendant demands trial by jury.**

_(signature)_

_____
Attorney for Defendant

SMITHAMUNDSEN, LLC
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3200 (phone)
(312) 894-3210 (facsimile)
Firm No. 42907

    I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

_(signature)_

_____
Attorney for Defendant

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

3005827-GEA/MCF/BMW

## IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
## OF CHRISTIAN COUNTY, ILLINOIS

Robby Mohr, as Administrator of the Estate of )
Jolee Mohr, )
                                    )
              Plaintiff, )
                                      )
v.                                  )   No. 08-L-31
                                      )
Targeted Genetics, Inc., et. al. )
                                      )
             Defendants. )

**FILED**

MAY – 6 2009

*Julie J. Mayer*
Circuit Clerk, Christian County

## DEFENDANT TARGETED GENETICS, INC.'S
## ANSWER TO PLAINTIFF'S COMPLAINT AT LAW

NOW COMES the Defendant, Targeted Genetics, Inc., by and through its

attorneys, SmithAmundsen LLC, and for its Answer to Plaintiff's Complaint at Law,

states as follows:

### PARTIES

1.    Plaintiff Robby Mohr was the husband of Jolee Mohr. He files this action

individually and as the administrator of the Estate of Jolee Mohr. (A copy of Letters of

Administration is attached as Exhibit A). He is a citizen and resident of Taylorville,

Christian County, Illinois.

**ANSWER:**    This Defendant denies knowledge and information sufficient to answer as to
the truth or falsity of the allegations contained in paragraph 1 of Plaintiff's
Complaint at Law and therefore neither admits nor denies the same but
demands strict proof thereof.

2.    Defendant Targeted Genetics, Inc. ("TG") is a Washington corporation that

purports to discover, develop, manufacture and market biotherapeutics and

biopharmaceuticals. TG is located at 1100 Olive Way, Seattle, Washington, 98101.

**ANSWER:**    This Defendant admits the allegations contained in paragraph 2 of Plaintiff's
Complaint at Law.

3.    Defendant Abbott Laboratories, Inc., (Abbott) is an Illinois corporation with a principal place of business in Abbott Park, Illinois, and transacts business regularly in Christian County, Illinois, including but not limited to the sale and delivery of its drug Humira to Plaintiff's decedent in Christian County, Illinois.

**ANSWER:**    This Defendant denies knowledge and information sufficient to answer as to the truth or falsity of the allegations contained in paragraph 3 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

4.    Defendant Western Institutional Review Board, Inc. ("WIRB") is an independent institutional review board ("IRB") contracted to protect the interests of patients enrolled in clinical trials and to monitor the protocols to ensure that they comply with federal regulations. WIRB is believed to be a Washington corporation with a principal place of business at 3535 7th Avenue, SW, Olympia, Washington 98502.

**ANSWER:**    The allegations in paragraph 4 contain the pleaders' conclusions of law and evidence and therefore no answer is required by this Defendant. To the extent that an answer is required, Defendant denies the allegations in this paragraph pertaining to the contracted duties of WIRB. This Defendant denies knowledge and information sufficient to answer as to the truth or falsity of the remaining allegations contained in paragraph 4 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

## INTRODUCTION

5.    For seven years preceding Jolee Mohr's date of death on July 24, 2007, Jolee Mohr was treated for rheumatoid arthritis which was under control with various established treatments and drugs.

**ANSWER:**    This Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 5 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

6.    During this period of time, Jolee Mohr was prescribed Humira, a TNF inhibitor manufactured by defendant Abbott.

2

**ANSWER:** This Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 6 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

7.     Prior to July 2007, Ms. Mohr appeared in excellent health despite her diagnosis and was active and mobile, and exhibited few serious signs of arthritis. She and her husband were loving parents of a five year old daughter.

**ANSWER:** This Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 7 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

8.     During this period of time, Ms. Mohr considered Dr. Robert Trapp of Springfield, Illinois, as her trusted physician who acted solely in her best interest when treating her.

**ANSWER:** This Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 8 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

9.     On or about February 2007, Dr. Trapp informed Ms. Mohr that he considered her to be a good candidate for a clinical trial sponsored by defendant TG titled "A Phase ½ Study of Repeat Intra-Articular Administration of tgAAC94, a Recombinant Adeno-Associated Vector Containing the TNFR:Fe Fusion Gene, in Inflammatory Arthritis Subjects with and without Concurrent TNF-alpha Antagonists" ("the experiment").

**ANSWER:** This Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 9 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

10.     The experiment involved gene transfer in which subjects were injected with millions of particles of tgAAC94, a genetically modified virus called "adeno-

3

associated virus" containing an Enbrel gene. Enbrel is also a TNF inhibitor. TgAAC94 was designed and manufactured by defendant Targeted Genetics.

**ANSWER:** This Defendant admits the allegations contained in paragraph 10 of Plaintiff's Complaint at Law.

11. Patients on a TNF inhibitor such as Humira should not be placed on any other TNF inhibitor such as Enbrel, because such combination can result in serious adverse reaction.

**ANSWER:** The allegations in paragraph 11 of Plaintiff's Complaint at Law contain the pleaders' conclusions of law and evidence and therefore no answer is required by this Defendant. To the extent that an answer is required, Defendant denies the allegations in this paragraph,

12. The experiment was a double blind, placebo-controlled, multicenter study sponsored and designed by defendant TG.

**ANSWER:** This Defendant admits the allegations contained in paragraph 12 of Plaintiff's Complaint at Law.

13. TG had contracted with WIRB to serve as the federally required IRB.

**ANSWER:** This Defendant admits the allegations contained in paragraph 13 of Plaintiff's Complaint at Law.

14. TG and WIRB designated and approved Dr. Trapp to serve as a Principal Investigator for the experiment conducted at his site, "The Arthritis Center."

**ANSWER:** This Defendant admits the allegations contained in paragraph 14 of Plaintiff's Complaint at Law.

15. The Protocol which governed the experiment, however, was designated and approved by TG and WIRB.

**ANSWER:** This Defendant admits the allegations contained in paragraph 15 of Plaintiff's Complaint at Law.

16. Because the experiment involved gene transfer, it had originally been presented to the Recombinant DNA Activities Committee, known as the "RAC," a federal advisory committee established by the National Institutes of Health.

**ANSWER:** This Defendant admits the allegations contained in paragraph 16 of Plaintiff's Complaint at Law.

17. When the RAC reviewed the Protocol in September 2003, it made, among other things, the following recommendations:

    a. "The roles of the treating physician for the patient and the investigator of the study should be clearly separated. This would help ensure that the patient's decision to forgo systemic therapy for persistence of disease in a single joint precedes or is separate from the decision to enroll in the study. When a researcher is also the personal physician of the patient, an independent third party should discuss the details of the study with the patient and carry out the consent and enrollment processes with the potential research participant. These stipulations and the role of the third party should be clearly delineated in the protocol."

    b. "Consideration should be given to developing a test to assess how well potential research participants understand certain aspects of the study. Such a test could help determine whether a potential participant understands that the study's goal is to evaluate the safety of the study agent and that direct benefits are not expected; standard medications are available that may be effective for the treatment of the disease; and the study agent cannot be considered superior to currently available standard medications."

**ANSWER:** This Defendant admits that the RAC reviewed *a* protocol in 2003 and made the comments alleged in paragraph 17 of Plaintiff's Complaint at Law.

5

18.     Notwithstanding these recommendations to the contrary, TG and WIRB assigned Dr. Trapp the role of Principal Investigator and encouraged him to recruit and induce his longtime patients, such as Ms. Mohr, into enrolling in the experiment and convincing them it was in their best therapeutic interest to do so.

**ANSWER:**     This Defendant denies the allegations contained in paragraph 18 of Plaintiff's Complaint at Law.

19.     During the recruitment process, Dr. Trapp represented to Ms. Mohr that the experiment was what he called "gene therapy," a phrase which by itself denotes that it is therapeutic and beneficial.    In fact, "gene therapy" is a purely experimental procedure which, despite its promise, has been proven neither safe nor effective for any human disease or ailment.

**ANSWER:**     This Defendant denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 19 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

20.     Dr. Trapp provided Ms. Mohr with a document titled "Research Subject Information and Consent Form," ("Consent Document"), a copy of which is attached as Exhibit "B." The Consent Form was drafted and approved by TG and WIRB.

**ANSWER:**     This Defendant admits the allegations contained in paragraph 20 of Plaintiff's Complaint at Law.

21.     The Consent Form and the discussions with Dr. Trapp were fully authorized and promoted by TG and WIRB, and were materially misleading and deceptive in several respects, including:

a.     the procedure was not described as "a human experiment" and instead was represented to be therapeutic in nature;

b.     the risk of toxic effects of the injection of the virus vectors owned by TG was understated;

6

c. there was no warning that the experiment presented a risk of death to human subjects;

d. there was no warning that a prior gene therapy experiment, affiliated with a company subsequently purchased by TG, had resulted in the death of an 18 year old volunteer at the University of Pennsylvania;

e. gene transfer was represented as a proven therapy and not an unproven and high risk procedure with consequences unknown to even the world's premier gene transfer scientists;

f. the procedure was represented as safe and effective for the treatment of rheumatoid arthritis;

g. there was no disclosure that prior animal studies revealed uncontrolled spread of the virus in the gene transfer which could trigger an uncontrolled immune response; and

h. the financial conflicts of interest inherent in the experiment were not disclosed.

**ANSWER:** This Defendant denies the allegations contained in paragraph 21, including subparagraphs (a) through (h), of Plaintiff's Complaint at Law in their entirety and demands strict proof thereof.

22. Induced by these misrepresentations and falsehoods, and believing that enrolling in the experiment was in her best therapeutic interest, Ms. Mohr agreed to participate.

**ANSWER:** This Defendant admits that Ms. Mohr agreed to participate in the study but denies the remaining allegations contained in paragraph 22 of Plaintiff's Complaint at Law.

23. The experiment was unethical because it presented significant risk to Ms. Mohr with no benefit whatsoever.

7

**ANSWER:** This Defendant denies the allegations contained in paragraph 23 of Plaintiff's Complaint at Law.

24.    Ms. Mohr, a mother of a young child and a loving wife, would never have agreed to participate in the experiment had she known it presented a risk of death, even if it offered a potential cure for her mild rheumatoid arthritis, which it did not.

**ANSWER:** This Defendant denies knowledge and information sufficient to form an answer as to the truth or falsity of the allegations contained in paragraph 24 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

25.    Dr. Trapp injected Ms. Mohr on two separate occasions as part of the protocol designed and controlled by TG and WIRB.

**ANSWER:** This Defendant admits the allegations contained in paragraph 25 of Plaintiff's Complaint at Law.

26.    On February 26, 2007, Ms. Mohr received her first injection, although it was not known whether she received the virus vector or placebo; Ms. Mohr suffered no ill effects from this injection nor did she discern any benefit.

**ANSWER:** This Defendant admits that Ms. Mohr received her first injection on or about February 27, 2007 and that it was not revealed to her whether she received the virus vector or placebo. This Defendant denies knowledge and information sufficient to form an answer as to the truth or falsity of the remaining allegations contained in this paragraph and therefore neither admits nor denies the same but demands strict proof thereof.

27.    On July 2, 2007, Dr. Trapp injected directly into Ms. Mohr's joint the virus vector manufactured and distributed by TG.

**ANSWER:** This Defendant admits the allegations contained in paragraph 27 of Plaintiff's Complaint at Law.

28.    Almost immediately thereafter, Ms. Mohr began to experience nausea and pain; by the next afternoon she started vomiting and her temperature rose to 101 degrees. Although another patient injected by Dr. Trapp with the virus experienced the

8

same acute symptoms after an injection, Dr. Trapp did not identify Ms. Mohr's reaction as being linked to the experiment and neither the FDA nor WIRB were notified of an adverse event.

**ANSWER:**    This Defendant denies knowledge and information sufficient to form an answer as to the truth or falsity of the allegations contained in paragraph 28 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

29.    By July 7, 2007, Ms. Mohr's temperature reached 104 degrees and she was admitted to the emergency room; when Dr. Trapp was notified, he advised again that this was not a reaction to the experiment and still did not report the event to the FDA or WIRB.

**ANSWER:**    This Defendant denies knowledge and information sufficient to form an answer as to the truth or falsity of the allegations contained in paragraph 29 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

30.    Ms. Mohr quickly deteriorated. By July 9, 2007, physicians at St. John's hospital in Springfield noted that her liver enzymes were elevated and that she had elevated white blood count.

**ANSWER:**    Upon information and belief, this Defendant admits the allegations in paragraph 30 of Plaintiff's Complaint at Law.

31.    By July 18, 2007, Mr. Mohr was critically ill. Though conscious, she was suffering from liver and kidney failure, loss of blood and sepsis; she was transferred late that night to the University of Chicago in Cook County as a potential liver and kidney transplant.

**ANSWER:**    Upon information and belief, this Defendant admits the allegations in paragraph 31 of Plaintiff's Complaint at Law.

9

32. By the time she arrived, all of Ms. Mohr's organs were failing; she was suffering from a severe internal hematoma; her body was full of infection, her immune system seemingly ceasing to exist.

**ANSWER:** Upon information and belief, this Defendant admits the allegations in paragraph 32 of Plaintiff's Complaint at Law.

33. When the doctors at the University of Chicago learned that Ms. Mohr had received gene transfer, they immediately suspected a connection between her condition and her participation in the experiment.

**ANSWER:** This Defendant denies knowledge and information sufficient to form an answer as to the truth or falsity of the allegations contained in paragraph 33 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

34. On July 19, 2007, physicians at the University of Chicago informed the FDA of a serious adverse event connected to a gene transfer trial.

**ANSWER:** Upon information and belief, this Defendant admits the allegations in paragraph 32 of Plaintiff's Complaint at Law.

35. Not until the next day, July 10, 2007, did TG inform the FDA that Ms. Mohr's critical condition was "possibly related" to the trial it was conducting at The Arthritis Center in Springfield.

**ANSWER:** This Defendant denies the allegations contained in paragraph 35 of Plaintiff's Complaint at Law.

36. The night of July 22, 2007, was the last night Ms. Mohr was conscious and the last time she was able to communicate with her husband.

**ANSWER:** This Defendant denies knowledge and information sufficient to form an answer as to the truth or falsity of the allegations contained in paragraph 36 of Plaintiff's Complaint at Law and therefore neither admits nor denies the same but demands strict proof thereof.

10

37.    On or about July 24, 2007 Ms. Mohr died as a direct and proximate result of her participation in the experiment, or as a result of the experimental drug combined with prior intake of Humira.

**ANSWER:**    This Defendant denies the allegations contained in paragraph 37 of Plaintiff's Complaint at Law.

38.    Thereafter, Ms. Mohr was autopsied at the University of Chicago Medical Center.

**ANSWER:**    Upon information and belief, this Defendant admits the allegations in paragraph 38 of Plaintiff's Complaint at Law.

## COUNT I

### NEGLIGENCE vs. TARGETED GENETICS AND WIRB
### (Survival Action)

39.    Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

**ANSWER:**    As and for its response to paragraph 39, this Defendant restates and realleges its responses to paragraphs 1-38 as and for its response to paragraph 39 for as though fully set forth herein.

40.    At all times mentioned herein and material hereto, TG and WIRB, and each of them respectively, jointly and severally, were charged with the professional responsibility of conducting an ethical experiment where risks did not greatly exceed benefits, of determining the universe of harm through proper preclinical animal studies, of properly conducting the informed consent process, of rendering proper care and treatment of Ms. Mohr, of properly and carefully examining her in order to determine her condition and eligibility for the experiment, of properly and carefully designing and administering the experiment's protocol in a careful and prudent fashion, and assuring

11

that proper care and attention were provided during all periods of time during which she remained under defendants' care and treatment.

**ANSWER:** This Defendant acknowledges only those duties imposed upon it by law, and denies that Plaintiff has properly characterized those duties in paragraph 40 of his Complaint at Law and denies that it breached any duties owed by it to Plaintiff's decedent.

41. As a result of the careless, negligent and reckless conduct of the defendants, Ms. Mohr was caused to suffer excruciating and agonizing pain and discomfort.

**ANSWER:** This Defendant denies the allegations contained in paragraph 41 of Plaintiff's Complaint at Law.

42. Defendants together, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel, medical assistants and employees were careless, negligent and reckless in:

   a.    failing to conduct an ethical experiment in accordance with the standards and guidelines governing human subject research;

   b.    failing to determine the universe of harm through preclinical animal studies;

   c.    failing to properly conduct the informed consent process;

   d.    failing to properly and adequately evaluate Ms. Mohr's condition and eligibility for the experiment;

   e.    failing to properly and adequately treat her condition;

   f.    failing to properly and adequately care for her condition;

   g.    failing to provide and afford proper and careful care;

12

h.     failing to perform proper and careful research practices and procedures in accordance with the standards prevailing in the community;

i.     failing to properly care for her condition under all of the circumstances;

j.     caring for Ms. Mohr in a negligent and improper manner;

k.     failing to properly monitor her condition both prior to and subsequent to the delivery of the experiment's investigational drugs;

l.     failing to inform Ms. Mohr of all the risks of the experiment so as to afford her with the opportunity to make an informed decision as to the injection of virus vectors;

m.     failing to design, implement and monitor an experiment in accordance with the ethical standards for such experiments;

n.     failing to remove Ms. Mohr from the experiment;

o.     failing to warn Ms. Mohr regarding the danger of the virus vector; and

p.     acting negligent per se.

**ANSWER:**     This Defendant denies the allegations contained in paragraph 42, including subparagraphs (a) through (p), of Plaintiff's Complaint at Law in their entirety and demands strict proof thereof.

43.     As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness and willful and wanton conduct of defendants, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel and employees, Ms. Mohr was caused to sustain serious and excruciating personal injuries which ultimately led to her death.

**ANSWER:** This Defendant denies the allegations contained in paragraph 43 of Plaintiff's Complaint at Law and demands strict proof thereof.

44. She was caused to suffer agonizing aches, pains and mental anguish; she sustained loss of enjoyment of life and loss of life's pleasures, and she suffered dignitary harm.

**ANSWER:** This Defendant denies the allegations contained in paragraph 44 of Plaintiff's Complaint at Law and demands strict proof thereof.

45. As a result of her injuries, she has been prevented from performing all of her usual duties, occupations, recreational activities and avocation all to her and her beneficiary's loss and detriment.

**ANSWER:** This Defendant denies the allegations contained in paragraph 45 of Plaintiff's Complaint at Law and demands strict proof thereof.

46. By conducting themselves as described above, defendants increased the risk of harm, thereby causing the injuries to Ms. Mohr.

**ANSWER:** This Defendant denies the allegations contained in paragraph 46 of Plaintiff's Complaint at Law and demands strict proof thereof.

## COUNT II

## WRONGFUL DEATH vs. TARGETED GENETICS AND WIRB

47. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries suffered, and are suffering for an indefinite period of time in the future, damages, injuries and losses, including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from Ms. Mohr, including monies which Ms. Mohr would have provided for such items as clothing, shelter, food, medical care and education.

**ANSWER:** This Defendant denies the allegations contained in paragraph 47 of Plaintiff's Complaint at Law.

14

48.  As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries would have been, continue to be and will be in the future wrongfully deprived of large and various sums of money which Ms. Mohr would have contributed to their support.

**ANSWER:**  This Defendant denies the allegations contained in paragraph 48 of Plaintiff's Complaint at Law.

49.  As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries incurred or have been caused to incur and paid large and various expenses, various funeral, burial and estate administration.

**ANSWER:**  This Defendant denies the allegations contained in paragraph 49 of Plaintiff's Complaint at Law.

50.  Plaintiff makes claim, on behalf of Ms. Mohr's heirs-at-law and next-of-kin, for the loss of love, affection, companionship, services, earnings, support and all other damages recoverable under the Wrongful Death Statute.

**ANSWER:**  The allegations in paragraph 50 of Plaintiff's Complaint at Law contain the pleaders' conclusions of law and evidence and therefore no answer is required by this Defendant.

## COUNT III

## STRICT PRODUCTS LIABILITY vs. TARGETED GENETICS AND ABBOTT
### (Survival Action)

51.  Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

**ANSWER:**  As and for its response to paragraph 51, this Defendant restates and realleges its responses to paragraphs 1-50 as and for its response to paragraph 51 for as though fully set forth herein.

52.  Defendant TG designed and manufactured the virus vector.

**ANSWER:**  This Defendant admits the allegations contained in paragraph 52 of Plaintiff's Complaint at Law.

53.  Defendant Abbott manufactured, distributed and sold Humira.

**ANSWER:** Upon information and belief, this Defendant admits the allegations contained in paragraph 53 of Plaintiff's Complaint at Law.

54. Defendants breached their duties and obligations by various sections of the Restatement of Torts, 2d, including Section 402(a) and are liable for causing injuries and death to Ms. Mohr for the following reasons:

    a. designing, manufacturing, and/or distributing a product in a defective condition;

    b. designing, manufacturing, and/or distributing a product which was unreasonably dangerous;

    c. designing, manufacturing, and/or distributing a product which was not safe for normal use and consumption;

    e. failing to have adequate warnings on the product;

    f. designing, manufacturing, and/or distributing a product which could have been produced and manufactured more safely;

    g. designing, manufacturing, and/or distributing a product for which it was foreseeable that someone would be harmed by the product's use;

    h. designing, manufacturing, and/or distributing a product for which was not safe for its intended use;

    i. designing, manufacturing, and/or distributing a product which was lacking of one or more elements necessary to make it safe for its intended use;

    j. designing, manufacturing, and/or distributing a product which was defective and which could cause injury to the user;

    k. failing to properly monitor her condition both prior to and subsequent to the delivery of the experiment's investigational drugs;

16

l.      failing to ensure that ultimate users were advised of the dangers of said product;

m.      failing to exercise reasonable care in the design of this product;

n.      failing to exercise reasonable care in the distribution of this product;

o.      failing to adequately and properly test this product;

p.      failing to use reasonable care under the circumstances;

q.      producing a product which was defective and could cause injury to the user;

r.      supplying a product which was defective and could cause injury to the user;

s.      failing to adequately and properly test the product after its design and manufacture;

t.      failing to investigate and analyze prior adverse reactions information in order to warn and/or notify ultimate users of the product defects and dangers;

u.      violating applicable sections of the Restatement of Torts, 2d; and

v.      engaging in other acts regarding the manufacturing, designing, testing, preparing, producing and distributing this product as will be learned in discovery.

**ANSWER:**   This Defendant denies the allegations contained in paragraph 54 of Plaintiff's Complaint at Law in that duties arise by operation of law and not by the conclusory allegations of the pleader. This Defendant does admit to all duties imposed by law. This Defendant denies the allegations contained in paragraph 54, including subparagraphs (a) through (v), of Plaintiff's Complaint at Law in their entirety and demands strict proof thereof.

55. As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness and willful and wanton conduct of defendants, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel and employees, Ms. Mohr was caused to sustain serious and excruciating personal injuries which ultimately led to her death.

**ANSWER:** This Defendant denies the allegations contained in paragraph 55 of Plaintiff's Complaint at Law and demands strict proof thereof.

56. She was caused to suffer agonizing aches, pains and mental anguish; she sustained loss of enjoyment of life and loss of life's pleasures, and she suffered dignitary harm.

**ANSWER:** This Defendant denies the allegations contained in paragraph 56 of Plaintiff's Complaint at Law and demands strict proof thereof.

57. As a result of her injuries, she has been prevented from performing all of her usual duties, occupations, recreational activities and avocation all to her and her beneficiary's loss and detriment.

**ANSWER:** This Defendant denies the allegations contained in paragraph 58 of Plaintiff's Complaint at Law and demands strict proof thereof.

58. By conducting themselves as described above, defendants increased the risk of harm, thereby causing the injuries to Ms. Mohr.

**ANSWER:** This Defendant denies the allegations contained in paragraph 58 of Plaintiff's Complaint at Law and demands strict proof thereof.

### COUNT IV

## WRONGFUL DEATH vs. TARGETED GENETICS AND ABBOTT

59. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries suffered, and are suffering for an indefinite period of time in the future, damages,

18

injuries and losses, including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from Ms. Mohr, including monies which Ms. Mohr would have provided for such items as clothing, shelter, food, medical care and education.

**ANSWER:** This Defendant denies the allegations contained in paragraph 59 of Plaintiff's Complaint at Law.

60. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries would have been, continue to be and will be in the future wrongfully deprived of large and various sums of money which Ms. Mohr would have contributed to their support.

**ANSWER:** This Defendant denies the allegations contained in paragraph 60 of Plaintiff's Complaint at Law.

61. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries incurred or have been caused to incur and paid large and various expenses, various funeral, burial and estate administration.

**ANSWER:** This Defendant denies the allegations contained in paragraph 61 of Plaintiff's Complaint at Law.

62. Plaintiff makes claim, on behalf of Ms. Mohr's heirs-at-law and next-of-kin, for the loss of love, affection, companionship, services, earnings, support and all other damages recoverable under the Wrongful Death Statute.

**ANSWER:** The allegations in paragraph 62 of Plaintiff's Complaint at Law contain the pleaders' conclusions of law and evidence and therefore no answer is required by this Defendant.

## DEFENDANT TARGETED GENETICS, INC.'S AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AT LAW

NOW COMES the Defendant, TARGETED GENETICS, INC., by and through its attorneys, SMITHAMUNDSEN LLC, and for its Affirmative Defenses to the Plaintiff's Complaint at Law, states as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Assumption of the Risk)

1.    On February 12, 2007, Plaintiff's decedent, Jolee Mohr, signed and executed an informed consent document agreeing to participate in a research study conducted by this Defendant, TARGETED GENETICS, INC., which is more thoroughly referenced in Plaintiff's Complaint. See Informed Consent document attached hereto as Exhibit "A".

2.    The executed informed consent document advised Plaintiff's decedent, Jolee Mohr, regarding the nature of the study being conducted, including the risks, hazards, discomforts and potential benefits associated with the conduction of the study, along with the patient's rights pertaining to her participation in said study. See Exhibit "A".

3.    Subsequent to her signed execution of the informed consent document, Plaintiff's decedent, Jolee Mohr, voluntarily participated in the study referenced in Plaintiff's Complaint.

4.    Plaintiff, Robby Mohr, as Administrator of the Estate of Jolee Mohr, has now filed a Complaint alleging that Plaintiff's decedent, Jolee Mohr, suffered personal injuries and death resulting from her participation in the study conducted by this Defendant, TARGETED GENETICS, INC.

20

5. Plaintiff's decedent, Jolee Mohr, signed and executed the informed consent document that clearly advised her of the possibility of non-yet-identified side effects that could result in her pain discomfort, disability or death. See Exhibit "A".

6. By signing and executing the informed consent document prior to her participation in the study referenced in Plaintiff's Complaint, Plaintiff's decedent, Jolee Mohr, voluntarily assumed the risks associated with her participation in said study, including the possibility of unknown side effects that could result in her pain discomfort, disability or death.

WHEREFORE, this Defendant, TARGETED GENETICS, INC., respectfully requests that this Honorable Court enter judgment in favor of this Defendant and against Plaintiff, including all court costs and attorney's fees in this matter and for any further relief this Court deems just and appropriate.

**SECOND AFFIRMATIVE DEFENSE**
**(Preemption)**

1. Plaintiff has filed a four-count Complaint at Law alleging state law claims for negligence directed toward this Defendant, TARGETED GENETICS, INC.

2. Plaintiff's state law claims asserted in his Complaint are preempted in whole or in part by federal law, including all applicable statutory and regulatory schemes executed and administered by the Federal Food and Drug Administration, and/or federal common law.

3. This Defendant, TARGETED GENETICS, INC., is entitled to the benefit of all defenses, limitations and rights afforded by applicable federal law.

WHEREFORE, this Defendant, TARGETED GENETICS, INC., respectfully requests that this Honorable Court enter judgment in favor of this Defendant and against Plaintiff, including all court costs and attorney's fees in this matter and for any further relief this Court deems just and appropriate.

Respectfully Submitted,

SmithAmundsen LLC

By: *Glen E. Amundsen*

One of the Attorneys for Defendant, Targeted Genetics, Inc.

Glen E. Amundsen
Margaret C. Firnstein
Brent M. Wills
SmithAmundsen LLC
150 N. Michigan Avenue
Suite 3300
Chicago, IL 60601
(312) 894-3200

22

IN THE CIRCUIT COURT FOR THE FOURTH JUDICIAL CIRCUIT

CHRISTIAN COUNTY, ILLINOIS

ROBBY MOHR, as Administrator of    )
the Estate of JOLEE MOHR,          )
                                   )
          Plaintiff,               )
                                   )
     -vs-                          )
                                   )
                                   )
TARGETED GENETICS, INC., et. al.   )
                                   )
          Defendants.              )

**FILED**

MAY - 6 2009

*Julie J. Mayer*
No. 08-L-31 Circuit Clerk, Christian County

### SUPPLEMENTAL ENTRY OF APPEARANCE

Now comes the firm of Dove & Dove, Attorneys at Law, and hereby enters its supplemental appearance on behalf of TARGETED GENETICS, INC., and requests that all pleadings and notices with regard to the above matter be directed to said attorneys at the address recited below.

TARGETED GENETICS, INC., Defendant
by Dove & Dove, Attorneys at Law,


by: _E C Thompson_____
                one of its attorneys



Dove & Dove, Attorneys at Law
Attorneys for Defendants
151 South Morgan Street
P. O. Box 647
Shelbyville, Illinois 62565-0647
Telephone: (217) 774-2137
FAX: (217) 774-2234

CERTIFICATE OF MAILING

I, E. C. Eberspacher, do hereby certify that I mailed a copy

of the attached and foregoing <u>SUPPLEMENTAL ENTRY OF APPEARANCE</u> to

the following:

> Louis A. DePaepe, esq.
> 222 West Market
> P.O. Box 77
> Taylorville, Illinois 62568

by placing the same in envelopes addressed to said persons, with

proper postage fully prepaid, and that said envelopes were

deposited in the United States Mail at Shelbyville, Illinois, on

the _____ day of May, 2009.

_E. C. Eberspacher_
E. C. Eberspacher

FOREIG

IN THE CIRCUIT COURT OF THE _____FOURTH_____ JUDICIAL CIRCUIT

_____CHRISTIAN_____ COUNTY, ILLINOIS

ROBBY MOHR, AS ADMINISTRATOR OF THE
ESTATE OF JOLEE MOHR,

                  **Plaintiff,**

**FILED**

JUN 17 2009

*Julie L. Mayer*
Circuit Clerk, Christian County

         **v.**
TARGETED GENETICS, INC.,

     **and**
ABBOTT LABORATORIES, INC.,

     **and**
WESTERN INSTITUTIONAL REVIEW BOARD, INC.,

             **Defendants.**

NO.      08-L-31

| | |
|---|---|
| 000300-1.3.1 06/01/09 15:10 | |
| REF CASE   # 08L 000031 | |
| 1 FOREIGN WRIT | 50.00 |
| 1 MILEAGE | 10.00 |
| REF SHERIFF # 283435 | |
| CASE TOTAL | 60.00 * |
| TOTAL | 60.00 TL |
| CHECK 1 | 60.00 |
| CASHIER: MARYANN | |

**SUMMONS**

To the defendant:  **Abbott Laboratories, Inc., c/o Registered Agent:  C T Corporation System,
208 S. LaSalle St., Suite 814, Chicago, IL  60604**

    YOU ARE SUMMONED and required to file an answer in this case, or otherwise file your appearance,

in the office of the clerk of this court_____**Christian County Circuit Court, Taylorville**_____,
                                    (Insert name of building, room number, and address, including city)

Illinois, within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO
DO SO, A JUDGMENT OR DECREE BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE
RELIEF ASKED IN THE COMPLAINT.

To the officer:  **Cook County Sheriff**

    This summons must be returned by the officer or other persons to whom it was given for service, with indorsement
of service and fees, if any, immediately after service.  If service cannot be made, this summons shall be returned so indorsed.
This summons may not be served later than 30 days after its date.

WITNESS _____May 21_____, 20 09

           (Seal of court)

                                _____Julie J. Mayer_____

                                   Clerk of court

                                   Associate Circuit Clerk-Deputy

Name    **Louis A. DePaepe**
            **Plaintiff**
Attorney for  **222 W. Market, P.O. Box**
Address
City  **Taylorville, IL  62568**
Telephone  **(217) 824-2104**

Date of service: _____, 20 ___.
(To be inserted by officer on copy left with defendant or other person)

TYPE LAW       SHERIFF'S OFFICE OF COOK COUNTY, ILLINOIS     DISTRICT 010

SHERIFF'S NUMBER 283435-001D CASE NUMBER 08L31     DEPUTY: _STROM 10104_

FILED DT 05-21-2009 RECEIVED DT 06-01-2009 DIE DT 06-16-2009 MULTIPLE SERVICE   1
    DEFENDANT                          ATTORNEY
ABBOTT LABORATORIES INC              LOUIS A DEPAEPE
208 S LA SALLE ST                    222 W MARKET
CHICAGO IL. 60604                    TAYLORVILLE IL. 62568
STE 814                              217 824-2104
PLAINTIFF ROBBY MOHR

SERVICE INFORMATION: C/O RA CT CORP SYSTEM     RS        FOREIGN

**************************************************************************************
(A)   I CERTIFY THAT I SERVED THIS SUMMONS ON THE DEFENDANT AS FOLLOWS:

.....1 PERSONAL SERVICE: BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT WITH THE
       NAMED DEFENDANT PERSONALLY.
.....2 SUBSTITUTE SERVICE: BY LEAVING A COPY OF THE SUMMONS AND A COPY OF THE COMPLAINT
       AT THE DEFENDANT'S USUAL PLACE OF ABODE WITH SOME PERSON OF THE FAMILY OR A PERSON
       RESIDING THERE, OF THE AGE OF 13 YEARS OR UPWARDS, AND INFORMING THAT PERSON OF
       THE CONTENTS THEREOF. ALSO, A COPY OF THE SUMMONS WAS MAILED ON THE
       _____ DAY OF _____ 20___, IN A SEALED ENVELOPE WITH POSTAGE FULLY
       PREPAID, ADDRESSED TO THE DEFENDANT AT HIS OR HER USUAL PLACE OF ABODE.
       SAID PARTY REFUSED NAME _____
...,.3 SERVICE ON: CORPORATION _X_ COMPANY ___ BUSINESS ___ PARTNERSHIP ___
       BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT (OR INTERROGATORIES) WITH THE
       REGISTERED AGENT, AUTHORIZED PERSON OR PARTNER OF THE DEFENDANT.
.....4 CERTIFIED MAIL ___

(B)   THOMAS J. DART, SHERIFF, BY: _____, DEPUTY   10104

   1   SEX   M/F    RACE _W_   AGE _60_
   2   NAME OF DEFENDANT ABBOTT LABORATORIES INC _____
      _WRIT SERVED ON _____
      THIS _4_ DAY OF _JUN_, 20_09_ TIME _9:30_ A.M.P.M.

ADDITIONAL REMARKS _____

**************************************************************************************

THE NAMED DEFENDANT WAS NOT SERVED. _____

TYPE OF BLDG _____          ATTEMPTED SERVICES

NEIGHBORS NAME _____     DATE     TIME A.M./P.M.

    ADDRESS _____     _____ __:__ ____

      REASON NOT SERVED:            _____ __:__ ____
                __07 EMPLOYER REFUSAL    _____ __:__ ____
_01 MOVED           __08 RETURNED BY ATTY    _____ __:__ ____
_02 NO CONTACT      __09 DECEASED
_03 EMPTY LOT       __10 BLDG DEMOLISHED     _____ __:__ ____
_04 NOT LISTED      __11 NO REGISTERED AGT.
_05 WRONG ADDRESS    __12 OTHER REASONS      _____ __:__ ____
_06 NO SUCH ADDRESS   __13 OUT OF COUNTY
                                      _____ __:__ ____

FEE   .00   MILEAGE    .00   TOTAL    .00           SG17

FORM 12 Circuit Court Summons        Bye ⸱inting Company, Springfield, IL

**IN THE CIRCUIT COURT OF THE** _____FOURTH_____ **JUDICIAL CIRCUIT**

_____CHRISTIAN_____ **COUNTY, ILLINOIS**

ROBBY MOHR, AS ADMINISTRATOR OF THE
ESTATE OF JOLEE MOHR,

           Plaintiff,

       v.

TARGETED GENETICS, INC.,

     and

ABBOTT LABORATORIES, INC.,

     and

WESTERN INSTITUTIONAL REVIEW BOARD, INC.,

           Defendants.

*FILED*
JUN 17 2009
*Julie J. Mayer*
Circuit Clerk, Christian County

NO.    08-L-31 ____

000300-1.3.1 06/01/09 15:10
REF CASE   # GSL 000031
   1 FOREIGN WRIT      50.00
   1 MILEAGE          10.00
REF SHERIFF # 283435
CASE TOTAL          60.00 1
         TOTAL        60.00 TL
CHECK 1            60.00
CASHIER: MARYANN

**SUMMONS**

To the defendant:   **Abbott Laboratories, Inc., c/o Registered Agent:   C T Corporation System,**
          **208 S. LaSalle St., Suite 814, Chicago, IL   60604**

       YOU ARE SUMMONED and required to file an answer in this case, or otherwise file your appearance,

in the office of the clerk of this court_____**Christian County Circuit Court, Taylorville**_____,

                               (Insert name of building, room number, address, including city)

Illinois, within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO
DO SO, A JUDGMENT OR DECREE BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE
RELIEF ASKED IN THE COMPLAINT.

To the officer:   **Cook County Sheriff**


       This summons must be returned by the officer or other persons to whom it was given for service, with indorsement
of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so indorsed.
This summons may not be served later than 30 days after its date.

WITNESS _____May 21_____, 20 09

(Seal of court)

_____Julie J. Mayer_____
            Clerk of court

_____
Associate Circuit Clerk-Deputy

Name   **Louis A. DePaepe**
Attorney for   **Plaintiff**
Address   **222 W. Market, P.O. Box**
City   **Taylorville, IL   62568**
Telephone   **(217) 824-2104**

Date of service: _____, 20 ____.
(To be inserted by officer on copy left with defendant or other person)

IN THE CIRCUIT COURT
FOR THE FOURTH JUDICIAL CIRCUIT OF ILLINOIS
CHRISTIAN COUNTY, TAYLORVILLE, ILLINOIS

ROBBY MOHR, as Administrator of      )
the ESTATE OF JOLEE MOHR,            )
                                     )
        Plaintiff,                   )
                                     )
        vs.                          )      AT LAW NO.
                                     )
TARGETED GENETICS, INC., ABBOTT      )      08-L-31
LABORATORIES, INC. and WESTERN       )
INSTITUTIONAL REVIEW BOARD, INC.,    )
                                     )
        Defendants.                  )

**FILED**

JUN 2 5 2009

*Julie J. Mayer*
Circuit Clerk, Christian County

### ENTRY OF APPEARANCE

Now comes Stephen L. Corn of Craig & Craig and hereby enters
his appearance on behalf of the Defendant, WESTERN INSTITUTIONAL
REVIEW BOARD, INC.

DATED this 24th day of June, 2009.

WESTERN INSTITUTIONAL REVIEW BOARD,
INC., Defendant

By _____
        Stephen L. Corn
        Of Craig & Craig
        1807 Broadway Avenue
        PO Box 689
        Mattoon, Illinois 61938
        Telephone: (217)234-6481
        Attorneys for Said Defendant

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing document was sent in envelopes securely sealed, legibly addressed and with the proper postage affixed thereto and deposited in the United States Mail at the United States Post Office, Mattoon, Illinois to:

Mr. Louis DePaepe
DePaepe Law Firm
222 West Market Street
PO Box 77
Taylorville, Illinois 62568

Mr. Alan C. Milstein
Sherman, Silverstein, Kohl,
 Rose & Podolsky
4300 Haddonfield Road
Pennsauken, New Jersey 08109

Mr. John Gianoulakis
Kohn, Shands, Elbert,
 Gianoulakis & Giljum, LLP
One US Bank Plaza
Suite 2410
St. Louis, Missouri 63101

Mr. E. C. Eberspacher
Dove & Dove
151 South Morgan Street
PO Box 647
Shelbyville, Illinois 62566-0647

Mr. Glen Amundsen
Smith Amundsen, LLC
150 North Michigan Avenue
Suite 3300
Chicago, Illinois 60601

DATED this 24th day of June, 2009.

_____
Stephen L. Corn of Craig & Craig
Attorney for Said Defendant

-2-

# RECORD SHEET

Case No. 08-L-31

Nature of Case

ROBBY MOHR, As Administrator of
Estate of JOLEE MOHR
                    PLAINTIFF

VS.

TARGETED GENETICS, INC.,
ABBOT LABORATORIES, INC.,
and
WESTERN INSTITUTIONAL REVIEW
BOARD, INC.
                    DEFENDANTS

Attorneys:

CRAIG & CRAIG
(WESTERN INST REVIEW)
P.O. Box 689
Mattoon, IL   61938

DEPAEPE LAW OFFICE
SMITH AMUNDSEN LLC & DOVE & DOVE
(TARGETED GENETICS)
150 N. Michigan AVe.
Suite 3300
Chicago, IL  60601

P.O. Box 647
Shelbyville, IL 62565

Form AO 69-32 Byers Printing Company, Springfield, IL.

| DATE | | | JUDGE AND REPORTER | | COSTS |
|---|---|---|---|---|---|
| 8 | 15 | 08 | | Complaint Civil Action filed w/JURY DEMAND. Affidavit Pursuant To Supreme Court Rule 222 filed. Motion To Allow Alan C. Milstein To Participate In This Case, Pro Hac Vice, Pursuant To Supreme Court Rule 707 filed. | $326.00 |
| 8 | 18 | 08 | | ORDER ENTERED AND FILED. | |
| 2 | 24 | 09 | | Summons issued to TARGETED GENETICS and returned to attorney service. | |
| 4 | 3 | 09 | | NOTICE OF HEARING BY CLERK filed and delivered to Plaintiff's attorney. (5-19-09 at 11:00 A.M.) | |
| 5 | 6 | 09 | | Notice of Filing filed. Appearance and JURY DEMAND filed. Defendant Targeted Genetics, Inc.'s Answer To Plaintiff's Complaint At Law filed. Supplemental Entry Of Appearance filed. | $86.00 |
| 5 | 19 | 9 | BP18L | Thom Depaepe. He reports case is complex + parties not ready for CMC. CMC 8/21/9 @ 11am. | |
| 5 | 21 | 09 | | Summons issued to ABBOTT LABORATORIES & WESTERN INSTITUTIONAL BOARD and returned to attorney for service. | |
| 6 | 17 | 09 | | Summons returned and filed showing service to ABBOTT LABORATORIES. | $60.00 |
| 6 | 25 | 09 | | Entry of Appearance filed. | $86.00 |