E-FILED
Monday, 14 December, 2009  12:25:36 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| Robby Mohr, Individually and as Administrator of Estate of Jolee Mohr | Case No.: 3:09-cv-03170-RM-CHE |
| Plaintiff, | |
| vs. | |
| Targeted Genetics, Inc., Abbott Laboratories, Inc., and Western Institutional Review Board, Inc. | |
| Defendants. | |

### FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, Robby Mohr, individually and as Administrator of the Estate of Jolee Mohr, through his attorneys, and for his First Amended Complaint, states as follows:

### PARTIES AND JURISDICTION

1. Plaintiff Robby Mohr was the husband of Jolee Mohr. He files this action individually and as the administrator of the Estate of Jolee Mohr. (A copy of Letters of Administration is attached as Exhibit A.) He is a citizen and resident of Taylorville, Christian County, Illinois.

2. Defendant Targeted Genetics, Inc. ("TG") is a Washington corporation that purports to discover, develop, manufacture and market biotherapeutics and biopharmaceuticals. TG is located at 1100 Olive Way, Seattle, Washington, 98101.

3. Defendant Abbott Laboratories, Inc., ("Abbott") is an Illinois corporation with a principal place of business in Abbott Park, Illinois, and transacts business regularly in Christian County, Illinois, including but not limited to the sale and delivery of its drug Humira to Plaintiff's decedent in Christian County, Illinois.

4. Defendant Western Institutional Review Board, Inc. ("WIRB") is an independent instituitional review board ("IRB") contracted to protect the interests of patients enrolled in clinical trials and to monitor the protocols to ensure that they comply with federal regulations. WIRB is believed to be a Washington corporation with a principal place of business at 3535 7th Avenue SW, Olympia, Washington, 98502.

5. The Federal Courts have no subject jurisdiction over this matter because the parties are not diverse and no federal question is at issue.

## INTRODUCTION

6. For seven years preceding Jolee Mohr's date of death on July 24, 2007, Jolee Mohr was treated for rheumatoid arthritis which was under control with various established treatments and drugs.

7. During this period of time, Ms. Mohr was prescribed Humira, a TNF inhibitor manufactured by defendant Abbott.

8. Prior to July 2007, Ms. Mohr appeared in excellent health despite her diagnosis and was active and mobile, and exhibited few serious signs of arthritis. She and her husband were loving parents of a five year old daughter.

9. During this period of time, Ms. Mohr considered Dr. Robert Trapp of Springfield, Illinois, as her trusted physician who acted solely in her best interest when treating her.

10. On or about February 2007, Dr. Trapp informed Ms. Mohr that he considered her to be a good candidate for a clinical trial sponsored by defendant TG titled "A Phase 1/2 Study of Repeat Intra-Articular Administration of tgAAC94, a Recombinant Adeno-Associated Vector Containing the TNFR:Fc Fusion Gene, in Inflammatory Arthritis Subjects with and without Concurrent TNF-alpha Antagonists" ("the experiment").

11. The experiment involved gene transfer in which subjects were injected with millions of particles of tgAAC94, a genetically modified virus called "adeno-associated virus" containing an Enbrel gene. Enbrel is also a TNF inhibitor. TgAAC94 was designed and manufactured by defendant Targeted Genetics.

12. Patients on a TNF inhibitor such as Humira should not be placed on any other TNF inhibitor such as Enbrel, because such combination can result in serious adverse reaction.

13. The experiment was a double blind, placebo-controlled, multicenter study sponsored and designed by defendant TG.

14. TG had contracted with WIRB to serve as the federally required IRB.

15. TG and WIRB designated and approved Dr. Trapp to serve as a Principal Investigator for the experiment conducted at his site, "The Arthritis Center."

16. TG and WIRB conducted no review to determine if Dr. Trapp was qualified to conduct a clinical trial, that he had an understanding of the the ethical requirements of conducting human subject research, or understood the risks of gene transfer.

17. The Protocol which governed the experiment, however, was designed and approved by TG and WIRB.

18. Because the experiment involved gene transfer, it had originally been presented to the Recombinant DNA Activities Committee, known as the "RAC," a federal advisory committee established by the National Institutes of Health.

19. When the RAC reviewed the Protocol in September 2003, it made, among other things, the following recommendations:

- o a. "The roles of the treating physician for the patient and the investigator of the study should be clearly separated. This would help ensure that the patient's

      decision to forgo systemic therapy for persistence of disease in a single joint precedes or is separate from the decision to enroll in the study. When a researcher is also the personal physician of the patient, an independent third party should discuss the details of the study with the patient and carry out the consent and enrollment processes with the potential research participant. These stipulations and the role of the third party should be clearly delineated in the protocol."

- b. "Consideration should be given to developing a test to assess how well potential research participants understand certain aspects of the study. Such a test could help determine whether a potential participant understands that the study's goal is to evaluate the safety of the study agent and that direct benefits are not expected; standard medications are available that may be effective for the treatment of the disease; and the study agent cannot be considered superior to currently available standard medications."

20.     Notwithstanding these recommendations to the contrary, TG and WIRB assigned Dr. Trapp the role of Principal Investigator and encouraged him to recruit and induce his longtime patients, such as Ms. Mohr, into enrolling in the experiment and convincing them it was in their best therapeutic interest to do so.

21.     During the recruitment process, Dr. Trapp represented to Ms. Mohr that the experiment was what he called "gene therapy," a phrase which by itself denotes that it is therapeutic and beneficial. In fact, "gene therapy" is a purely experimental procedure which, despite its promise, has been proven neither safe nor effective for any human disease or ailment.

22. Dr. Trapp provided Ms. Mohr with a document titled "Research Subject Information and Consent Form," ("Consent Document"), a copy of which is attached as Exhibit "B." The Consent Form was drafted and approved by TG and WIRB.

23. The Consent Form and the discussions with Dr. Trapp were fully authorized and promoted by TG and WIRB, and were materially misleading and deceptive in several respects, including:

- a. the procedure was not described as "a human experiment" and instead was represented to be therapeutic in nature;
- b. the risk of toxic effects of the injection of the virus vectors owned by TG was understated;
- c. there was no warning that the experiment presented a risk of death to human subjects;
- d. there was no warning that a prior gene therapy experiment, affiliated with a company subsequently purchased by TG, had resulted in the death of an 18 year old volunteer at the University of Pennsylvania;
- e. gene transfer was represented as a proven therapy and not an unproven and high risk procedure with consequences unknown to even the world's premier gene transfer scientists;
- f. the procedure was represented as safe and effective for the treatment of rheumatoid arthritis;
- g. there was no disclosure that prior animal studies revealed uncontrolled spread of the virus used in the gene transfer which could trigger an uncontrolled immune response;

5

- h. the financial conflicts of interest inherent in the experiment were not disclosed;

24. Induced by these misrepresentations and falsehoods, and believing that enrolling in the experiment was in her best therapeutic interest, Ms. Mohr agreed to participate.

25. The experiment was unethical because it presented significant risk to Ms. Mohr with no benefit whatsoever.

26. Ms. Mohr, a mother of a young child and a loving wife, would never have agreed to participate in the experiment had she known it presented a risk of death, even if it offered a potential cure for her mild rheumatoid arthritis, which it did not.

27. Dr. Trapp injected Ms. Mohr on two separate occasions as part of the protocol designed and controlled by TG and WIRB.

28. On February 26, 2007, Ms. Mohr received her first injection, although it was not known whether she received the virus vector or placebo; Ms. Mohr suffered no ill effects from this injection nor did she discern any benefit.

29. On July 2, 2007, Dr. Trapp injected directly into Ms. Mohr's joint the virus vector manufactured and distributed by TG.

30. Almost immediately thereafter, Ms. Mohr began to experience nausea and pain; by the next afternoon she started vomiting and her temperature rose to 101 degrees. Although another patient injected by Dr. Trapp with the virus experienced the same acute symptoms after an injection, Dr. Trapp did not identify Ms. Mohr's reaction as being linked to the experiment and neither the Food and Drug Administration ("FDA") nor WIRB were notified of an adverse event.

31. By July 7, 2007, Ms. Mohr's temperature reached 104 degrees and she was admitted to the emergency room; when Dr. Trapp was notified, he advised again that this was not a reaction to the experiment and still did not report the event to the FDA or WIRB.

32. Ms. Mohr quickly deteriorated. By July 9, 2007, physicians at St. John's hospital in Springfield noted that her liver enzymes were elevated and that she had an elevated white blood count.

33. By July 18, 2007, Ms. Mohr was critically ill. Though conscious, she was suffering from liver and kidney failure, loss of blood and sepsis; she was transferred late that night to the University of Chicago in Cook County as a potential liver and kidney transplant.

34. By the time she arrived, all of Ms. Mohr's organs were failing; she was suffering from a severe internal hematoma; her body was full of infection, her immune system seemingly ceasing to function.

35. When the doctors at the University of Chicago learned Ms. Mohr had received gene transfer, they immediately suspected a connection between her condition and her participation in the experiment.

36. On July 19, 2007, physicians at the University of Chicago informed the FDA of a serious adverse event connected to a gene transfer trial.

37. Not until the next day, July 10, 2007, did TG inform the FDA that Ms. Mohr's critical condition was "possibly related" to the trial it was conducting at The Arthritis Center in Springfield.

38. The night of July 22, 2007, was the last night Ms. Mohr was conscious and the last time she was able to communicate with her husband.

39. On July 24, 2007, Ms. Mohr died as a direct and proximate result of her participation in the experiment, or as a result of the experimental drug combined with prior intake of Humira.

40. Thereafter, Ms. Mohr was autopsied at the University of Chicago Medical Center.

41. Humira's label at the time failed to warn physicians of the serious risk of histoplasmosis; rather, the warnings section of the package insert solely mentioned the risk of infection, as follows:

> SERIOUS INFECTIONS, SEPSIS, TUBERCULOSIS AND RARE CASES OF OPPORTUNISTIC INFECTIONS, INCLUDING FATALITIES, HAVE BEEN REPORTED WITH THE USE OF TNF BLOCKING AGENTS INCLUDING HUMIRA. MANY OF THE SERIOUS INFECTIONS HAVE OCCURRED IN PATIENTS ON CONCOMITANT IMMUNOSUPPRESSIVE THERAPY THAT, IN ADDITION TO THEIR RHEUMATOID ARTHRITIS, COULD PREDISPOSE THEM TO INFECTIONS.[1]

42. On September 4, 2008, in response to a number of deaths involving histoplasmosis in patients treating with TNF blockers, the FDA ordered Abbott to incorporate stronger warnings into Humira's label, in addition to the mandated black box warning regarding infection risk already in place, advising of the risk of fungal infections and histoplasmosis in particular.

43. The revised label warning provides as follows:

Risk of Serious Infections

Patients treated with HUMIRA are at increased risk for developing serious infections that may lead to hospitalization or death. Most patients who developed these infections were taking concomitant immunosuppressants such as methotrexate or corticosteroids. HUMIRA should be discontinued if a patient develops a serious infection or sepsis. Reported infections include:

---

1   See Humira package insert, attached hereto as Exhibit C, at page 12.

- Active tuberculosis (TB), including reactivation of latent TB. Patients with TB have frequently presented with disseminated or extrapulmonary disease. Patients should be tested for latent TB before HUMIRA use and during therapy. Treatment for latent infection should be initiated prior to HUMIRA use.

- Invasive fungal infections, including histoplasmosis, coccidioidomycosis, candidiasis, aspergillosis, blastomycosis, and pneumocystosis. Patients with histoplasmosis or other invasive fungal infections may present with disseminated, rather than localized, disease. Antigen and antibody testing for histoplasmosis may be negative in some patients with active infection. Empiric anti-fungal therapy should be considered in patients at risk for invasive fungal infections who develop severe systemic illness.

- Bacterial, viral and other infections due to opportunistic pathogens.

The risks and benefits of treatment with HUMIRA should be carefully considered prior to initiating therapy in patients with chronic or recurrent infection. Patients should be closely monitored for the development of signs and symptoms of infection during and after treatment with HUMIRA, including the possible development of TB in patients who tested negative for latent TB infection prior to initiating therapy.[2]

## COUNT I

### NEGLIGENCE vs. TARGETED GENETICS AND WIRB
(Survival Action)

44. Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

45. At all times mentioned herein and material hereto, TG and WIRB, and each of them respectively, jointly and severally, were charged with the professional responsibility of

---

[2]  See http://www.humirapro.com/

conducting an ethical experiment where risks did not greatly exceed benefits, of determining the universe of harm through proper preclinical animal studies, of properly conducting the informed consent process, of rendering proper care and treatment to Ms. Mohr, of properly and carefully examining her in order to determine her condition and eligibility for the experiment, of properly and carefully designing and administering the experiment's protocol in a careful and prudent fashion, and of assuring that proper care and attention were provided during all periods of time during which she remained under defendants' care and treatment.

46. As a result of the careless, negligent and reckless conduct of the defendants, Ms. Mohr was caused to suffer excruciating and agonizing pain and discomfort.

47. Defendants together, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel, medical assistants and employees were careless, negligent and reckless in:

    a. failing to conduct an ethical experiment in accordance with the standards and guidelines governing human subject research;

    b. failing to determine the universe of harm through preclinical animal studies;

    c. failing to properly conduct the informed consent process;

    d. failing to properly and adequately evaluate Ms. Mohr's condition and eligibility for the experiment;

    e. failing to properly and adequately treat her condition;

    f. failing to properly and adequately care for her condition;

    g. failing to provide and afford proper and careful care;

  h. failing to perform proper and careful research practices and procedures in accordance with the standards prevailing in the community;

  i. failing to properly care for her condition under all of the circumstances;

  j. caring for Ms. Mohr in a negligent and improper manner;

  k. failing to properly monitor her condition both prior to and subsequent to the delivery of the experiment's investigational drugs;

  l. failing to inform Ms. Mohr of all the risks of the experiment so as to afford her with the opportunity to make an informed decision as to the injection of virus vectors;

  m. failing to design, implement and monitor an experiment in accordance with the ethical standards for such experiments;

  n. failing to remove Ms. Mohr from the experiment;

  o. failing to warn Ms. Mohr regarding the danger of the virus vector; and

  p. failing to determine whether Dr. Trapp had the experience and competence to conduct a clinical trial;

  q. failing to design a clinical trial where the benefits to the human subjects were not outweighed by the risks of harm, where clinical equipoise was not present, and which did not take into account the therapeutic misconception in the informed consent process.

48. As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness and willful and wanton conduct of defendants, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel and employees, Ms.

Mohr was caused to sustain serious and excruciating personal injuries which ultimately led to her death.

49. She was caused to suffer agonizing aches, pains and mental anguish; she sustained loss of enjoyment of life and loss of life's pleasures, and she suffered dignitary harm.

50. As a result of her injuries, she has been prevented from performing all of her usual duties, occupations, recreational activities and avocation all to her and her beneficiary's loss and detriment.

51. By conducting themselves as described above, defendants increased the risk of harm, thereby causing the injuries to Ms. Mohr.

WHEREFORE, Plaintiff claims of Defendants, TG and WIRB, and each of them respectively, jointly and severally, damages in excess of Fifty Thousand Dollars ($50,000), plus costs of suit.

## COUNT II

### WRONGFUL DEATH vs. TARGETED GENETICS AND WIRB

52. Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

53. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries suffered, and are suffering for an indefinite period of time in the future, damages, injuries and losses, including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from Ms. Mohr, including monies which Ms. Mohr would have provided for such items as clothing, shelter, food, medical care and education.

54. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries would have been, continue to be and will be in the future wrongfully deprived of large and various sums of money which Ms. Mohr would have contributed to their support.

55. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries incurred or have been caused to incur and paid large and various expenses various funeral, burial and estate administration.

56. Plaintiff makes claim, on behalf of Ms. Mohr's surviving spouse, for the loss of love, affection, companionship, services, earnings, support and all other damages recoverable under the Wrongful Death Statute.

**WHEREFORE**, plaintiff claims of defendants, Targeted Genetics and WIRB, and each of them respectively, jointly and severally, compensatory damages in excess of Fifty Thousand Dollars ($50,000.00), plus costs of suit.

## COUNT III

### STRICT PRODUCTS LIABILITY vs. TARGETED GENETICS AND ABBOTT
(Survival Action)

51. Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

52. Defendant TG designed and manufactured the virus vector.

53. Defendant Abbott manufactured, distributed and sold Humira.

54. As stated above, Ms. Mohr died as a direct and proximate result of her participation in the experiment, or as a result of the experimental drug combined with prior intake of Humira.

55. Humira's package insert did not warn physicians of the risk of histoplasmosis or the risks associated with taking Humira in conjunction with other TNF blockers. Had Ms. Mohr been aware of the risk of histoplasmosis, she would have constantly monitored herself for signs of infection.

56. Defendant TG breached its duties and obligations by various sections of the Restatement of Torts, 2d, including Section 402(a) and are liable for causing injuries and death to Ms. Mohr for the following reasons:

   a. designing, manufacturing, and/or distributing a product in a defective condition;

   b. designing, manufacturing, and/or distributing a product which was unreasonably dangerous;

   c. designing, manufacturing, and/or distributing a product which was not safe for normal use and consumption;

   d. supplying warnings with the product that it knew or should have known were inadequate;

   e. designing, manufacturing, and/or distributing a product which could have been produced and manufactured more safely;

   f. designing, manufacturing, and/or distributing a product for which it was foreseeable that someone would be harmed by the product's use;

   g. designing, manufacturing, and/or distributing a product for which was not safe for its intended use;

   h. designing, manufacturing, and/or distributing a product which was lacking of one or more elements necessary to make it safe for its intended use;

      i.      designing, manufacturing, and/or distributing a product which was defective and which could cause injury to the user;

      j.      failing to ensure that ultimate users were advised of the dangers of said product;

      k.      failing to exercise reasonable care in the design of this product;

      l.      failing to exercise reasonable care in the distribution of this product;

      m.      failing to adequately and properly test this product;

      n.      failing to use reasonable care under the circumstances;

      o.      producing a product which was defective and could cause injury to the user;

      p.      supplying a product which was defective and could cause injury to the user;

      q.      failing to adequately and properly test the product after its design and manufacture;

      r.      failing to investigate and analyze prior adverse reactions information in order to warn and/or notify ultimate users of the product defects and dangers;

      s.      failing to adequately warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the product of the potential risks and other serious side effects associated with the product, including, among other things, gallbladder disease and other serious and life threatening side effects;

      t.      violating applicable sections of the Restatement of Torts, 2d; and

      u.      engaging in other acts regarding the manufacturing, designing, testing, preparing, producing and distributing this product as will be learned in discovery.

57.     Defendant Abbott breached its duties and obligations by various sections of the <u>Restatement of Torts</u>, 2d, including Section 402(a) and are liable for causing injuries and death to Ms. Mohr for the following reasons:

   a.   selling a product it knew or should have known was in a defective condition by failing to adequately warn of the risk of histoplasmosis or the risks associated with taking Humira in conjunction with other TNF blockers;

   b.   selling a product which it knew or should have known was unreasonably dangerous to the user by failing to adequately warn of the risk of histoplasmosis or the risks associated with taking Humira in conjunction with other TNF blockers;

   c.   selling a product which it knew or should have known was not safe because of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

   d.   supplying warnings with the product that it knew or should have known were inadequate by failing to adequately warn of the risk of histoplasmosis or the risks associated with taking Humira in conjunction with other TNF blockers;

   e.   providing instructions to be followed with regard to the prescribing of this product that it knew or should have known were not accurate and truthful;

   f.   failing to warn users of the dangers inherent in using this product by failing to adequately warn of the risk of histoplasmosis or the risks associated with taking Humira in conjunction with other TNF blockers;

   g.   selling a product wherein it was foreseeable that someone would be injured upon ingesting the medication in question because of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  h. selling a product which it knew or should have known was not safe for its intended use because of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  i. selling a product which it knew or should have known was lacking of one or more elements necessary to make it safe for its intended use because of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  j. manufacturing a product which it knew or should have known was defective and which could cause injury to the user because of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  k. designing a product which it knew or should have known was defective and which could cause injury to the user because of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  l. distributing a product which it knew or should have known was defective and could cause injuries to a user because of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  m. failing to see that ultimate users were advised of the dangers of said product by failing to warn of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  n. failing to exercise reasonable care in the design of this product by failing to warn of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  o. failing to exercise reasonable care in the marketing of this product by failing to warn of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  p. failing to adequately and properly test said product;

  q. failing to use reasonable care under the circumstances by failing to adequately warn of the risk of histoplasmosis or the risks associated with taking Humira in conjunction with other TNF blockers;

  r. delivering a product which it knew or should have known was defective and could cause injury to the user by failing to adequately warn of the risk of histoplasmosis or the risks associated with taking Humira in conjunction with other TNF blockers;

  s. producing a product which it knew or should have known was defective and could cause injury to the user by failing to adequately warn of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  t. producing a product with component parts that defendant knew or should have known increased the risk of harm to the user;

  u. supplying a product which it knew or should have known was defective and could cause injury to the user by failing to adequately warn of the known risk of histoplasmosis and/or the risks associated with taking Humira in conjunction with other TNF blockers;

  v. violation of applicable sections of the Restatement of Torts, 2d;

  w. engaging in other acts regarding the manufacturing, designing, preparing, producing, distributing, advising and selling of Humira as will be learned in discovery.

58. As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness and willful and wanton conduct of defendants, and each of them respectively, jointly and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel and employees, Ms. Mohr was caused to sustain serious and excruciating personal injuries which ultimately led to her death.

59. She was caused to suffer agonizing aches, pains and mental anguish; she sustained loss of enjoyment of life and loss of life's pleasures, and she suffered dignitary harm.

60. As a result of her injuries, she has been prevented from performing all of her usual duties, occupations, recreational activities and avocation all to her and her beneficiary's loss and detriment.

61. By conducting themselves as described above, defendants increased the risk of harm, thereby causing the injuries to Ms. Mohr.

WHEREFORE, Plaintiff claims of Defendants, TG and Abbott, and each of them respectively, jointly and severally, damages in excess of Fifty Thousand Dollars ($50,000), plus costs of suit.

### COUNT IV

### WRONGFUL DEATH vs. TARGETED GENETICS AND ABBOTT

62. Plaintiff incorporates by reference the above paragraphs as if fully set forth at length herein.

63. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries suffered, and are suffering for an indefinite period of time in the future, damages, injuries and losses, including but not limited to, a loss of financial support, and the beneficiaries have been

wrongfully deprived of the contributions they would have received from Ms. Mohr, including monies which Ms. Mohr would have provided for such items as clothing, shelter, food, medical care and education.

64. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries would have been, continue to be and will be in the future wrongfully deprived of large and various sums of money which Ms. Mohr would have contributed to their support.

65. As a direct and proximate result of the foregoing, Ms. Mohr's beneficiaries incurred or have been caused to incur and paid large and various expenses such as funeral, burial and estate administration.

66. Plaintiff makes claim, on behalf of Ms. Mohr's surviving spouse, for the loss of love, affection, companionship, services, earnings, support and all other damages recoverable under the Wrongful Death Statute.

**WHEREFORE,** plaintiff claims of defendants, Targeted Genetics and Abbott, and each of them respectively, jointly and severally, compensatory damages in excess of Fifty Thousand Dollars ($50,000.00), plus costs of suit.

DEPAEPE LAW OFFICE

Date: December 14, 2009

s/ Louis A. DePaepe
Louis A. DePaepe
222 W. Market Street, P.O. Box 77
Taylorville, IL   62568

OF COUNSEL
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY

s/ Alan C. Milstein
Alan C. Milstein
4300 Haddonfield Road
Fairway Corporate Center, Suite 311
Pennsauken, New Jersey 08109